















ANDY   2/10/03   15:36

3:03-CV-00270   BENTON V. ASHCROFT

*2*

*P/A.*



SHEREEN J. CHARLICK
California Bar. No. 147533
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, California  92101-5008
(619) 234-8467

Attorneys for Petitioner

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH BENTON<br><br>        Petitioner,<br><br>v.<br><br>JOHN A. ASHCROFT, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE and UNITED STATES DEPARTMENT OF JUSTICE FEDERAL BUREAU OF PRISONS,<br><br>        Respondents. | Civil Action No.<br><br>'03 CV  0270 L   POR<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT FOR WRIT OF HABEAS CORPUS** |

## I. INTRODUCTION

Petitioner respectfully applies to the Court for a Writ of Habeas Corpus to remedy the unlawful retroactive application of a new rule changing Bureau of Prisons ("BOP") procedure  eliminating her ability to serve the custody portion of her imposed sentence at a "correctional" as opposed to a "penal" facility.  She is presently awaiting surrender on February 21, 2003 where she has been designated to surrender to FCI, Victorville. Accompanying this petition, petitioner has filed a motion for a preliminary injunction preventing the Bureau of Prisons from housing her in a penal facility as opposed to a CCC and for a stay of her self-surrender until these issues are resolved.

Petitioner is within the custody of the United States Department of Justice Federal Bureau of Prisons ("BOP") as a result of a 10- month sentence imposed on December 23, 2002 which included a judicial





recommendation for halfway house placement. As a result of actions on the part of the Department of Justice, the BOP has designated Ms. Benton to FCI, Victorville, a penal institution.

## II. FACTUAL BACKGROUND

On September 27, 2002, Ms. Deborah Benton entered a guilty plea to a one-count indictment charging her with violating 18 U.S.C. §1341, mail fraud. On December 23, 2002, the Honorable Barry Ted Moskowitz held a sentencing hearing where he found that the applicable adjusted offense level under the United States Sentencing Guidelines ("U.S.S.G.") was offense level 10 which fell within Zone C. The sentencing judge then declined to depart downwards, but, instead, imposed a split sentence of five months in custody, with a judicial recommendation that the custodial portion of this sentence be served in the Urban Work Cadre, operated out of a CCC, the Pacific Furlough, and five months home confinement. *See* Exhibit A, Judgment & Commitment Order. Petitioner was given a self-surrender date of February 21, 2003.

Unbeknownst to counsel, Ms. Benton, or the sentencing court, three days prior to the date of sentencing, the BOP promulgated this new policy, which is the subject of this habeas petition. *See* Exhibit B (letters and memos describing "procedure change").[1] According to the letter, this "procedure change" was due to "recent guidance form the U.S. Department of Justice's Office of Legal Counsel ("OLC") finding that the term 'community confinement' is not synonymous with 'imprisonment.'" *Id.* Had counsel and the sentencing court been aware of the new policy, this may have affected the district court's departure decisions and his fashioning of the sentence.[2] This is a petition pursuant to 28 U.S.C. § 2241, though, as an alternative, the

---

[1]   On December 23, 2002, the date of Ms. Benton's sentencing, the undersigned was entirely unaware of the new policy and it appears that the sentencing judge was also unaware or he would not have made a judicial recommendation which could not be implemented.

[2]   For example, knowing that Ms. Benton could only be designated to a prison, rather, than a CCC, he may have decided to depart two levels which would have placed Ms. Benton in Zone B, allowing for a sentence of probation with a condition of probation that she serve a portion of a sentence in a CCC. *See* U.S.S.G. § 5C1.1(c)(3), app. n.3(b).

1 | Court could construe it as a petition pursuant to 28 U.S.C. § 2255 and re-sentence Ms. Benton to probation

2 | and have her serve 5 months in a halfway house as a condition of probation since that would have been a

3 | permissible sentence in the first instance.  No exhaustion of remedies is required.[3]

4 |

5 | ### III. ARGUMENT

6 | **A.   Introduction**

7 | The BOP's new rule, which it refers to as a "procedure change," is both an erroneous reading of the

8 | controlling statute, 18 U.S.C. § 3621(b), and an abdication of its responsibilities to interpret that statute.  That

9 | statute clearly provides that BOP is solely responsible for designating an individual's place of imprisonment

10 | and that designation includes both "penal" and "correctional" facilities. CCCs are "correctional facilities" and

11 | therefore the BOP should allow inmates to reside at CCCs as previously permitted.  Assuming section

12 | 3621(b)'s meaning were not plain, the legislative history and other statutory schemes support the previous and

13 | refute the current interpretation of the statute.  This new interpretation of section 3621(b) cannot be accorded

14 |

15 | the usual deference due to agency interpretations of statutes because it ignores the long-standing and

16 | unchallenged prior interpretation and it is based upon erroneous legal reasoning.  By issuing this "procedure

17 | change," the BOP has also violated the strictures of the Administrative Procedure Act ("APA").  Finally, this

18 | change in policy operates retroactively to disadvantage and upset Ms. Benton's settled expectations which is

19 |

20 | impermissible.   Based on each of these arguments, Ms. Benton requests relief.

21 |

22 | _____

23 | [3] *Brown v. Rison*, 895 F.2d 533, 535 (9th Cir. 1990) ("The requirement that federal prisoners exhaust remedies before filing a habeas corpus petition was judicially created; it is not a statutory requirement.").  The purpose underlying exhaustion does not exist here; the Regional Designator for the BOP who determined that Ms. Benton was to be designated to FCI, Victorville cannot alter a nationwide policy change implemented by the BOP.  Hence, exhaustion would be futile in any event, thus, need not be attempted. *See Fraley v. Bureau of Prisons*, 1 F.3d 924, 925 (9th Cir. 1993) (holding that petitioner need not exhaust administrative remedies before filing for federal court review of decision to deny credit for pre-trial detention when Regional Director of BOP would "almost certainly have denied her request" pursuant to official BOP policy prohibiting issuance of credit for time spent on home confinement); *Howell v. INS*, 72 F.3d 288, 291 (2d Cir. 1995) (petitioner need not exhaust where would be futile).

**B.   The Statute: Its Plain Meaning  The Former & New Interpretations Thereof**

**1. Background & The Former Interpretation**

In 1930, the BOP was established within the Department of Justice to provide a central federal organization responsible for the care and treatment of federal prisoners. H.R. Rep. No. 106, 71st Cong., 2d Sess. 1 (1930).  The BOP is charged with the authority and responsibility under 18 U.S.C. § 3621(b) to "designate the place of . . . imprisonment" for prisoners who have been sentenced to a term of imprisonment under relevant federal statutes. BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau [of Prisons], whether maintained by the Federal Government or otherwise." 18 U.S.C. § 3621(b).[4]  The language now contained in section 3621(b) originated in the Act of May 14,1930, Pub. L. No. 71-218, 46 Stat. 325 ("1930 Act"), and was adopted to resolve an ambiguity as to who had the power to designate the place of confinement of federal prisoners. S.Rep.No. 533, 71st Cong., 2d Sess. 2 (1930) ("S. Rep. No. 533") (statement of the Attorney General).  The language enacted in 1930 has remained substantially unchanged through its present codification in 18 U.S.C. § 3621(b).  During the various reenactments of the provision, there was never any indication that the power to designate the place of confinement was, in any manner other than those specified in the statute, limited. *See, e.g.*, S. Rep. No. 225, 98th Cong., 1st Sess. 141 (1983).

As early as 1985, the BOP defined section 3621(b)'s term "imprisonment" as including CCCs because, according to a 1985 legal opinion, they constituted "correctional facilities."[5]  The BOP and related agencies

---

[4]Section 3621(b) is applicable to those convicted of offenses committed on or after November 1, 1987.  *See* 18 U.S.C. § 3621 note.  It is based on former 18 U.S.C. § 4082(b), *reprinted in* 18 U.S.C. § 4082 note, which governs as to offenses committed before November 1, 1987.  Former section 4082(b) provided in part that "[t]he Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise."

[5]  This 1985 legal opinion is referenced in Exhibit G but although requested by petitioner, has not been made available by the BOP.  A FOIA request is presently pending.

have consistently reiterated that definition over these many years. *See, e.g.*, Program Statement No. 7310.01 (contrary to home confinement, confinement to CCCs is deemed to be confinement to a "penal or correctional facility). The OLC, the same entity which now recommends that the BOP alter its well-established interpretation of section 3621(b), previously opined that the BOP's power under section 3621(b) to designate the place of incarceration of federal prisoners was "unqualified."[6] *Statutory Authority to Contract With the Private Sector for Secure Facilities,* 16 Op.OLC 65 (1992) (available at www.usdoj.gov/olc/quinlan.15.htm) ("1992 OLC opinion") Exhibit E. In this same opinion, in refuting the General Accounting Office's claim that the BOP's power to place inmates was limited to federal, state or local prisons, the OLC specifically states:

> On the contrary, there is evidence in the legislative history of section 3621(b) that at least after a 1965 amendment Congress specifically anticipated that BOP would designate privately operated facilities as places of incarceration. In 1965 Congress amended the designation provision to allow designation of a "facility" as well as an "institution." Act of Sept. 10, 1965, Pub. L. No. 89-176, 79 Stat. 674 (former § 4082(b), *reprinted in* 18 U.S.C. § 4082 note). **The word "facility" was defined to "include a residential community treatment center."** *Id.* at 675 (former § 4082(g), *reprinted in* 18 U.S.C. § 4082 note).[7] **The legislative history of former section 4082(g) indicates that by enacting that definition Congress intended that "facility" would include community treatment centers such as those already being used to place juvenile offenders.** *See* S. Rep. No. 613 at 3-4.

1992 OLC Opinion, Exhibit E (emphasis supplied, footnote in original). The OLC opinion further provided:

> The residential community treatment centers, to which the bill authorizes the Attorney General to commit and transfer prisoners, are similar to the so-called halfway houses now operated by the

---

[6] Title 18 U.S.C. § 4125(b) is additional authority for the establishment of alternative facilities for "imprisonment." It authorizes the Attorney General to "establish, equip, and maintain [work] camps upon sites selected by him . . . and designate such camps as places for confinement of persons convicted of an offense against the laws of the United States." Similarly, in a related statute, Congress authorized "inactive Department of Defense facilities for the confinement of United States Prisoners." 18 U.S.C. § 4001 note.

[7] The definition of "facility" in former section 4082(g) did not limit application of the term to residential community treatment centers. *See* 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.07, at 152 (3d ed. 1992 rev.) ("Sutherland") ("[T]he word 'includes' . . . conveys the conclusion that there are other items includable, though not specifically enumerated."). In any event, Congress deleted the definition of "facility" when it substantially reenacted section 4082(b) in section 3621(b).

Department of Justice for juvenile and youthful offenders. . . .   S. Rep. No. 613 at 3-4 (emphasis added).  According to the Senate Report, Congress envisioned that "under the bill's authority to use community centers for older types of prisoners *a similar variety of organizational plans will be adopted."  Id.* at 4  (emphasis in original).

Accordingly, for many years BOP has, "with the knowledge of Congress," contracted "for the placement of lower security inmates in private facilities, particularly contract Community Treatment Centers." 1985 Hearing at 22-23 (Testimony of Norman A. Carlson, Director, BOP). *See also id.* at 16-17.

It is also significant that the BOP's ability to rely upon these CCCs as places of imprisonment for inmates has led to enormous growth in the private sector of these facilities.  While the undersigned has been unable to obtain, on this short notice, current figures, the 1992 OLC report indicates that in 1984, approximately 80 percent of offenders serving sentences of **over six months** were doing so through contract CTCs.[8]  One can only assume that these numbers have increased in light of the great increase in the number of incarcerated individuals.  *See* Exhibit C (graph and article demonstrating growth of federal prison population).

Examination of the predecessor statute to section 3621(b) reveals that former section 4082(b), gave the Attorney General the authority to place a federal prisoner in a "facility" including, but not limited to, a residential community treatment center. Legislative history provides that Congress anticipated that these same types of residential community treatment center facilities were contemplated by the 1965 amendment as many already existed in connection with similar facilities for juvenile offenders. S. Rep. No. 613 at 3-4 (under the "authority to use community centers for older types of prisoners a similar variety of organizational plans will be adopted").

It has been the prevailing wisdom within the BOP, as advised by its legal counsel, the OLC, that there was no statutory basis in section 3621(b) for distinguishing between residential community facilities and other types of facilities for "imprisonment" purposes.  Because the plain language of section 3621(b) allows the

---

[8]  This means that necessarily, that neither the OLC nor the BOP read section 3624(c)'s provision regarding pre-release custody was not read to limit the BOP's ability to place individuals for only up to six months as the OLC now suggests is the appropriate reading in its December 20, 2002 memo, Exhibit B.

1  BOP to designate "any available penal or correctional facility," it was "unwilling to find a limitation on that

2  designation authority based on legislative history.  Moreover, the subsequent deletion of the definition of

3  "facility" under former section 4082 further undermines the argument that Congress intended to distinguish

4

5  between residential community facilities and other kinds of facilities." 1992 OLC Opinion, Exhibit E (citation

6  omitted).

7      Against this backdrop of the well-established interpretation of section 3621(b)'s phrase "correctional

8  facility" as including CCCs, BOP  authored numerous program statements and manuals restating time and

9

10  again their view that a CCC meets the definition of a "penal or correctional facility" pursuant to 18 U.S.C.

11  § 3621(b).  *See, e.g.*. BOP Program Statement 5100.07, chap. 4 at 2 (9/3/99) ("Security Designation and

12  Custody Classification Manual"); Program Statement 7300.09 ("Community Corrections Manual") 6.1.1, at

13  1 (1/12/98); *see also* Prog. Smt. 5100.07 ("Security Designation and Custody Classification Manual"), ch.4,

14

15  at 2 (9/3/99, with 1/31/2002 changes); Prog. Smt. 7300.09 ("Community Corrections Manual") § 6.1.1, at 1

16  (1/12/1998) ("Direct Court Commitments.  Direct court commitments are cases where a U.S. District Court

17  Judge or Magistrate Judge has imposed a short sentence (one year or less, or longer with approval from the

18  Regional Designator) of confinement with the recommendation that it be served in a contract CCC ... ");

19  Bureau of Prisons, "Judicial Resource Guide to the Federal Bureau of Prisons," at 16 (2000) (describing

20  "Direct Designation to a Community Corrections Center"); Bureau of Prisons, "A Judicial Guide to the

21

22  Federal Bureau of Prisons," at 10-11 (1995) ("Title 18 U.S.C. § 3621 provides that the Bureau of Prisons will

23  designate where a prisoner will serve his or her sentence . . . . The CCM [Communications Corrections

24  Manager] makes a determination . . . with court concurrence, whether he or she might appropriately be placed

25  in a contract community corrections facility.").      Even the United States Sentencing Commission was aware

26  of and has approved the practice of direct CCC designation under section 3621(b).  In a joint report to

27  Congress pursuant to 28 U.S.C. § 994(q) entitled "Maximum Utilization of Prisons Resources" (June 30,

28

1 | 1994), the Commission and BOP considered the statutory mandate to ensure that the classification system

2 | results in "placing inmates in the least restrictive facility necessary to ensure security." 28 U.S.C. § 994(q)(2).

3 | As the joint report noted:

4 |

5 | > Community correction centers (CCC) provide two program components within their facilities: a pre-release component and a community corrections component. ... The

6 | > community corrections component is designed to be sufficiently punitive to be a legitimate sanction, meeting the needs of the court and society, yet allowing the

7 | > offender to undertake other responsibilities, such as participation in work ... Except

8 | > for employment and other required activities, offenders in the CCC component must remain in the facility at all times. Recreation, visitation, and other activities and

9 | > programs are provided in-house.

10 | Maximum Utilization Report, at 9-10.

11 |

12 | ## 2.    The New Interpretation

13 | The BOP's new "procedure change" or policy is a categorical refusal to directly designate individuals

14 | to CCCs which it had previously deemed "correctional facilities,"and a categorical refusal to designate

15 | individuals with greater than 10% or six months remaining on their federal sentence to these CCCs. It is due

16 | to a rebuke issued by Department of Justice officials criticizing the BOP for "lenient" treatment afforded to

17 | white-collar criminals in the wake of corporate scandals. *See* Exhibit F. It resulted the in OLC's issuance of

18 | an opinion on December 13, 2002, advising the BOP that it could no longer consider CCCs as "correctional

19 | facilities." *See* OLC Memorandum for Larry D. Thompson, Deputy Attorney General, Exhibit B pp. 4-5.

20 | According to the OLC Memorandum, the "procedure change" went into effect as of December 20, 2002,

21 | however, dissemination of this information did not occur until after the petitioner's sentencing in this case.

22 | The OLC Memorandum opines that the BOP no longer has the "discretion" to designate individuals directly

23 | to CCCs, to serve their federal sentences because "community confinement does not constitute imprisonment

24 | " as that term is used in 18 U.S.C. § 3621(b)" *Id.* at 1; Exhibit B at 4. The new opinion is based upon the

25 | following three flawed assertions; (1) the BOP's longstanding interpretation of section 3621(b) conflicts with

26 |

27 | provisions of the Sentencing Guidelines, U.S.S.G. § 5C1.1; (2) it conflicts with cases which have relied upon

28 |

8

1 this Guidelines provision; and (3) it conflicts with 18 U.S.C. § 3624(c) which, according to the "new"

2 interpretation only permits the BOP's placing an inmate in community confinement only for the last 10% or

3 six months of his or her sentence, whichever is less. These assertions will be addressed *infra* at pp. 17-20.

4 The new interpretation cannot be squared with the statute's plain meaning nor with its legislative history.

5

6 Neither should deference should be accorded to the agency's "new" interpretation as it is unreasonable.

7 **2. The plain meaning**

8 Title 18, United States Code, Section 3621, entitled "Imprisonment of a Convicted Person,"

9

10 directs the BOP regarding how to house inmates. Subsection 3621(b) states:

11 **Place of imprisonment**: The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any
12 available *penal* or *correctional facility* that meets minimum standards of health and habitability established by the Bureau. . . .
13

14 18 U.S.C. § 3621(b) (emphasis supplied). Our analysis begins with the language of the statute. As

15 the Supreme Court has recently said, in construing a statute the one "cardinal canon before all others" is that

16 we must "presume that a legislature says in a statute what it means and means in a statute what it says there."

17 *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). "When the words of a statute are

18

19 unambiguous, then, this first canon is also the last: '[the] inquiry is complete.'" *Id.* at 254 (quoting *Rubin v.*

20 *United States*, 449 U.S. 424, 430 (1981)); *Chevron, U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*,

21 467 U.S. 837 (1984) (in reviewing the construction of a statute, courts first must look to the text of the statute

22 to determine whether Congress "has directly spoken to the precise question at issue." If Congress has made

23 clear its intent through the exact language used in the legislation, that ends the court's inquiry).

24

25 The plain language of section 3621(b) gives the BOP open-ended authority to place federal

26 prisoners in "any available penal or correctional facility" that meets minimum standards of health and

27 habitability. The statute contains two phrases describing imprisonment: penal facilities and correctional

28 facilities, both of which must be given meaning. *Ratzlaf v. United States*, 510 U.S. 135, 140-41 (1994)

1   (admonishing that judges should hesitate to treat statutory terms as surplusage)(other internal citations

2   omitted); *see also Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 253-54 (1994) (rejecting a construction

3   of the Railway Labor Act because the proffered construction of the statute would render the phrase after the

4   disjunctive term "mere surplusage") (other internal quotations omitted);*United States v. Johnson,* 37

5

6   F.3d1352, 1353 (9th Cir. 1994) (advising that "courts should avoid interpretations that render some portions

7   of the [Sentencing] [G]uidelines superfluous") (citing *United States v. Powell,* 6 F.3d 611, 615 (9th Cir. 1993)

8   (statutes are not to be construed as containing surplusage).  It follows that each of these terms are used because

9   they refer to different sorts of facilities.  Logically, a "penal" institution is a prison or detention center, such

10  as an MCC.  However, by contrast, a "correctional facility" can be defined a number of ways.

11

12           Aside from the history attendant to the BOP's prior definition of imprisonment as including

13  CCCs and their encouragement of the growth of a number of these type of facilities in order to accommodate

14  its definition, there is much support for the argument that "correctional facility" not only implies an alternative

15  to penal institutions, such as prisons and detention centers, but that it directly includes CCCs.   The term

16  "CCC" itself, widely used by the DOJ and BOP, stands for "community corrections center."  *See* Exhibit B.

17  Notably, the employment title of the individual who wrote a memorandum received by inmates informing

18  them of the change in policy is "Community Corrections Manager."  Exhibit B.  The Memorandum for Chief

19  Executive Officers detailing this new policy is from the "Correctional Programs Division."  *See id.* In fact,

20

21  as is demonstrated above, CCCs were developed due to the BOP's need to place individuals in "correctional

22  facilities."  *See supra* at pp. 7-8.  It follows that CCCs must therefore be considered "correctional facilities,"

23  per the language of § 3621(b), by both the BOP and the DOJ.  The Pacific Furlough Facility which administers

24  the Urban Work Cadre program is clearly a  such a "correctional facility" operated under the auspices of the

25

26  BOP itself.   Hence, under the plain meaning of section 3621(b), Ms. Benton can be housed there.

27

28

1    The Supreme Court has interpreted the language of this statute favorably to Ms. Benton. In

2  *Reno v. Koray*, 515 U.S. 50, 61 (1995), the Court recognized that "community corrections centers" meet 18

3  U.S.C. § 3621(b)'s definition of a "penal or correctional facility. *Id.* (citing U.S. Dept. of Justice, Bureau of

4  Prisons Program Statement No. 7310.02 (Oct. 19, 1993). According to *Reno v. Koray*, the significant factor

5  in determining whether or not someone was subject to imprisonment or pre-trial release was not the nature

6  of the facility but rather whether or not the individual was subject to the control of the BOP. *See id.*; *see also*

7  *Randall v. Whelan*, 938 F.2d 522, 525 (4th Cir. 1991) (defendants who are "detained" or "sentenced" always

8  remain subject to the control of the Bureau).  Ms. Benton is under the control of the BOP.

9
10

11   **C.  Under <u>Chevron</u>, the Bureau of Prisons New Interpretation Should Not Be Afforded Any Deference.**

12

13    While the plain meaning and the legislative intent is clear from section 3621(b), assuming

14  *arguendo*, that it were not, the BOP's "new" interpretation, should not be accorded deference.  The Supreme

15  Court has held that if Congress's legislative intent is not clear from the wording of a statute, and therefore the

16  statute requires interpretation, courts must evaluate the regulations created by the agency charged with

17  enforcing the statute.  *Chevron*, 467 US. at 2782.  Here, while the BOP has purported to "reinterpret" the

18  statute in a manner entirely distinct from its longstanding prior interpretation which was left unchallenged,

19  its "new" interpretation is not entitled to *"Chevron* deference" for three reasons: (1) it is an unreasonable

20  interpretation because it ignores the difference between penal and correctional facilities, it ignores a host of

21  regulations which BOP promulgated utilizing this interpretation, and it imposes a nonstatutory limitation on

22  the BOP's designation authority; (2) if the genesis of this "new interpretation" was to align the BOP's views

23  with those of the Sentencing Commission and the DOJ, this interpretation is not the BOP's, and it is not

24  entitled to deference, and (3) all three purported reasons underlying this "procedure change," as set forth by

25  the OLC in Exhibit B pp. 4-7, are flawed.

26
27
28

11

In *Chevron*, the Court created two sets of instructions for courts in determining whether regulations are valid.  First, if Congress explicitly left a "gap" in the legislation which it expected the agency to fill, the enforcing agency should draft appropriate regulations.  *Id.*  So long as these regulations are not "arbitrary, capricious, or manifestly contrary to the statute," courts shall give them "controlling weight."  *Id.*  On the other hand, if the statute is "silent or ambiguous" with respect to interpretation on a particular issue, *Chevron* held that agencies should establish "reasonable" regulations to elucidate what is meant by the legislation.  *Id.*  If the regulations result from a "reasonable interpretation" of the statute, courts shall follow those regulations and refrain from substituting their own constructions of statutory provisions.  *Id.*

Section 3621(b) distinguishes between two types of facilities: penal and correctional.  To the extent that it did not not clearly set out the definition of "correctional facility," it left it up to the BOP to give that term meaning.  The term "correctional facility" as found in section 3621(b) is a general directive regarding the "place of imprisonment" of all, not just a certain group of prisoners, such as those referenced in section 3624.  In interpreting section 3621(b), the BOP encouraged the development and operation of a number of CCCs as a direct result of its interpretation of this subsection as "allowing it to place an inmate in a CCC for **more** than the 'last ten per centum of the term, or more than six months, if appropriate."  *See* BOP Program Statement 7310.04 (12/16/98), Exhibit D.

Assuming, *arguendo*, that section 3621(b) is vague and "silent" as to the meaning of "correctional facility," *Chevron* and its progeny dictate that the BOP must interpret the "statutory scheme" to give it effect.  *Chevron* holds that this interpretation should be respected so long as it is a "reasonable" one.  The BOP did in fact make its determination of Congress's intent long ago when it determined that it could place certain inmates in certain circumstances in CCCs.

Notably, the *Chevron* Court also provided: "we have long recognized that considerable weight should be afforded to an executive department's construction of a statutory scheme it is entrusted to

administer, and the principle of deference to administrative interpretations." *Id.* (citing *Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 389 (1984), *Blum v. Bacon,* 457 U.S. 132, 141 (1982), *Union Electric Co. EPA,* 427 U.S. 246, 256 (1976), *Investment Company Institute v. Camp,* 401 U.S. 617, 626-27 (1971)) (other citations omitted).  It is this precise finding that directs those affected by a certain regulation to respect an agency's determination of what the law should be in that agency's field.  It is also this finding that demonstrates that the BOP's original interpretation of section 3621 was correct and should control.

The BOP promulgated a number of regulations both indicating that the term "correctional facilities" may be defined broadly and that such a definition includes CCCs.  Title 28 CFR § 91.1, pertaining to grants for correctional facilities, states that grants will be made available to states to " . . . operate or improve correctional facilities, including boot camp facilities and other *alternative correctional facilities* that can free conventional space for the confinement of violent offenders . . . " (emphasis supplied). The regulation reiterates elsewhere that:  "[c]orrectional facilities includes boot camps and other alternative correctional facilities for adults or juveniles that can free conventional bed space for the confinement of violent offenders." 28 CFR § 91.2.  Furthermore, another regulation pertaining to employees' benefits states:

> Confinement.  In general a jail, prison, or other penal institution or *correctional facility* is a facility which is under the control and jurisdiction of the agency in charge of the penal system or in which convicted criminals can be incarcerated.  Confinement in such a facility continues as long as you are under a sentence of confinement and have not been released due to parole or pardon.  *You are considered confined even though you are temporarily or intermittently outside of the facility (e.g., on work release, attending school, or hospitalized).*

20 CFR § 404.1506. (emphasis supplied).  The last sentence of this regulation certainly refers to confinement in a halfway house or CCC, as those institutions exist for the very purpose of confining an individual except for times when the individual is allowed to leave the premises for purposes of "work release," "attending school," or other appointments.  Accordingly, this sentence would be unnecessary if

1  "correctional facilities" did not include CCCs.  In fact, the BOP's former interpretation is necessary in order

2  to give meaning to the phrase "or correctional facility" which, given its appearance in the statute after "penal,"

3  makes clear that the BOP's initial designation authority extends to halfway houses.  This point carries forward

4  a 1965 amendment to the predecessor statute, former section 4082(b), which added the phrase "or facility"

5  after "institution" in specifying the kinds of places that could be designated for service of a sentence, and

6

7  defined "facility" to "include a residential community treatment center."  18 U.S.C. § 4082(g) (former

8  provision).  This history was recounted by the Office of Legal Counsel itself just ten years ago, concluding:

9

10          There is, moreover, no basis in section 3621(b) for distinguishing between residential
            community facilities and secure facilities.  Because the plain language of section
11          3621(b) allows BOP to designate 'any available penal or correctional facility,' we are
            unwilling to find a limitation on that designation authority based on legislative history.
12          Moreover, the subsequent deletion of the definition of 'facility' further undermines the
            argument that Congress intended to distinguish between residential community
13          facilities and other kinds of facilities.

14

15  "*Statutory Authority to Contract With the Private Sector for Secure Facilities*," 16 Op.OLC 65 (1992)

16  (available at www.usdoj.gov/olc/quinlan.15.htm).  Exhibit E.  The legislative history of the 1984 Sentencing

17  Reform Act reveals no intent at all to limit the BOP's authority, in existence since 1965 at least, to designate

18  a CCC as the place for service of a sentence of imprisonment.  "Proposed 18 U.S.C. § 3621(b) follows

19

20  existing law  . . . .  After considering [specified] factors, the Bureau of Prisons may designate the place of

21  imprisonment in an appropriate type of facility . . . "  Sen. Judiciary Comm., "Comprehensive Crime Control

22  Act of 1983," S. Rep. 98-225, 98th Cong., 1st Sess., at 141-42 (1983) (emphasis added).  Section "3621(b)

23  was 'not intended to change pre-existing law with respect to the authority of the Bureau.'"  *McCarthy v. Doe*,

24

25  146 F.3d 118, 123 n.2 (2d Cir. 1998).  Since that pre-existing law included the authority to designate a CCC

26  for service of a sentence of imprisonment, the respondent's action in this case is contrary to Supreme Court

27  and Circuit court precedent regarding the governing statute.

28

1    The BOP's interpretation of section 3621 was viewed as "reasonable" and remained unchanged until

2  recently when the DOJ came under fire for the treatment of a few white collar offenders. *See* Exhibit F. Due

3  to mounting political pressures and associated public criticism, the DOJ essentially recalled the BOP's

4  interpretation of the law that allowed the agency to place inmates in CCCs in some situations. The DOJ thus

5  imposed its *new* interpretation of this old law, despite its lack of expertise to do so. As a matter of public

6  policy, it will not do to have one agency superimpose its will and legal interpretation on another agency,

7  which is exactly what the DOJ has done here. *See* Exhibit B (stating that pursuant to the OLC's "guidance,"

8  the BOP has adopted the finding that the terms "community confinement" and "imprisonment" should not be

9
10  used interchangeably.).

11

12    It is significant that the agency's former interpretation of section 3621(b) as allowing initial

13  designations of and direct commitments to a CCC in satisfaction of a sentence of imprisonment, as stated in

14  Program.Statement 7310.02 (1993), was expressly noted and approved by the Supreme Court in *Reno v.*

15  *Koray*, 515 U.S. at 62. The Court held that such interpretations in Program Statements of statutes the BOP

16  is charged with implementing and administering, such as its interpretation of this statute, are entitled to "some

17

18  deference," *id.* at 61, so long as they represent "a 'permissible construction of the statute.'" *Id.* (quoting

19  *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984)), "Once we have

20  determined a statute's clear meaning, we adhere to that determination under the doctrine of stare decisis, and

21
22  we judge an agency's later interpretation of the statute against our prior determination of the statute's

23  meaning.").

24    *Chevron* deference cannot mean that agencies can make precipitous changes in well-established

25  interpretations of statutes based upon political pressure. Indeed, the historical nature of the prior interpretation

26
27  should militate against deferring to any new construction barring some momentous change in the law, the

28

1  circumstances or a manifestation of contrary congressional intent.  None of the above is present here.  This

2  interpretation unreasonable and should not be accorded deference.

3      **D. The OLC's Purported Reasons Are Unreasonable.**

4      Not one of the three reasons stated presently by the OLC to justify this significant departure from a

5  longstanding interpretation of a statute demonstrate that not one, either separately or in combination can

6

7  withstand scrutiny.

8      The OLC  indicated that the BOP's longstanding practice of using CCCs[9] as a "substitute for

9  imprisonment is inconsistent with U.S.S.G. § 5C1.1.[10]  Such inconsistency arises, it asserts, because the

10

11  Sentencing Guidelines define community confinement and distinguish it from imprisonment and provide that

12  defendants who fall within Zones C and D of the Sentencing Guidelines Table are not eligible for a direct

13  commitment to community confinement without serving at least a portion (for Zone C individuals) if not the

14  entire sentence (Zone D individuals) by a term of "imprisonment." *Id.*  Thus, according to the OLC, the BOP

15

16  violates this dictate of the Sentencing Guidelines when it designates these Zone C or D individuals to CCCs.

17      This is simply not the case.  There is no tension between U.S.S.G. § 5C1.1 and the former

18  interpretation of section 3621(b).  In fact, there is no indication whatsoever that the Sentencing Commission

19  considered 18 U.S.C. § 3621(b) or intended to encroach upon the BOP's interpretation of this statute in any

20  fashion.  Section 5C1.1 is only meant to constrain sentencing judges' ability to regulate the type of prison

21

22  facility when  imposing some type of imprisonment as a condition of supervised release or probation – this

23  is the only time judges have actual authority as opposed to the ability to recommend, certain conditions of

24  confinement in combination with probation or supervised release, *see* U.S.S.G. 5C1.1(c)(2)-(3), App. n. 3(B),

25

26  _____

27      [9] CCCs are not just "community confinement centers," but also referred to as "community corrections centers."

28      [10] U.S.S.G. § 5C1.1(f) states: "If the applicable range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment."

16

1   4(B).  Put another way, section 5C1.1 exists to limit sentencing judges – not the BOP.  It circumscribes the

2   classes of individuals, Zones A, B and split sentence recipients from Zone C, and the manner in which district

3   court judges can dictate places of incarceration (only as a condition of probation or supervised release or as

4   a portion of a split sentence) for good reason – in order to leave the discretion to place inmates in any "penal

5

6   or correctional facility" with the BOP, the agency charged with this decisionmaking authority by Congress.

7   See 18 U.S.C. § 3621(a), (b) ("A person who has been sentenced to a term of imprisonment . . . shall be

8   committed to the custody of the Bureau of Prisons . . . . [which] shall designate the place of the prisoner's

9   imprisonment").  Thus, section 5C1.1 provides that there are only these three instances where sentencing

10  courts, as opposed to the BOP, can dictate where an individual is to be imprisoned.  Again, there is good

11  justification for this.  Were the BOP to receive judicial dictates regarding placement of inmates in every case

12  as opposed to "recommendations," their mission as per section 3621(b) regarding making that determination

13  after considering the five factors set forth in the statute[11] could never be fulfilled.  In addition, one could only

14  imagine the problems which would arise if judges, who are generally unaware of security classifications

15

16  attendant to certain inmates and institutions were to be making binding decisions for all inmates.  In fact, by

17  limiting the individuals for whom judges can make such binding determinations to those falling within Zones

18  A, B and over a portion of a split sentence in Zone C, the Sentencing Commission ensured that this group of

19  individuals would be limited and are most likely to be the lowest security risks – either people with little to

20  no criminal history convicted of relatively minor offenses by virtue of where they fall within the Sentencing

21

22

23

24      [11]  Section 3621(b) provides that the BOP is to make a decision regarding place of

25  imprisonment, whether it be penal or correctional facility based upon the following five factors:

26          "(1) the resources of the facility contemplated;

27          (2) the nature and circumstances of the offense;
            (3) the history and characteristics of the prisoner;

28          (4) any statement by the court that imposed the sentence . . . .
            (5) any pertinent policy statement issued by the Sentencing Commission pursuant to
        section 994(a)(2) of title 28.  18 U.S.C. § 3621(b).

                                            17

Guidelines Table. Aside from that ability provided pursuant to section 5C1.1, judges never had and do not possess today the authority to order that an individual serve a sentence in a particular facility. *See, e.g. Ledesma v. United States*, 445 U.S. 1323, 1324 (1971) ("[I]t is the responsibility of the Attorney General to designate the place at which a convicted prisoner is to serve his sentence . . . . He is free to accept or reject the recommendation of the sentencing court as to the place of confinement"); *United States v. Janiec*, 505 F.2d 983, 986 (3rd Cir. 1975) ("[A]ttempts to prescribe the place of confinement . . . is surplusage and ineffective"). All they could ever do was to recommend a particular type of imprisonment, whether it be penal or CCC or home confinement. Nothing in section 5C1.1 purports to expand or limit that authority.[12] That the BOP was given greater authority to select from among conditions of confinement to satisfy the term of "imprisonment" imposed by the judge is not a surprising principle since it has both statutory and historical basis and the BOP has access to all the statistics and information in order to properly make that decision.

To the extent that the Court believes there is an inconsistency between the Sentencing Commission's view and of the BOP's former interpretation, the Sentencing Commission is only authorized to interpret and promulgate guidelines to fulfill the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2). 28 U.S.C. § 991. Nowhere in its grant of statutory authority is the Sentencing Commission directed to interpret section 3621(b), to define "imprisonment" or to exclude CCCs from any such definition. To the extent that the Sentencing Commission has purported to do so, any such interpretation is unauthorized and beyond its delegated responsibilities. *See* 28 U.S.C. § 991, *et seq..* Indeed, the BOP is ordered by Congress in section 3621(b) to consider only as one of five factors, the Sentencing Commission's policy statements, and nowhere does the statute authorize the Sentencing Commission to interpret section 3621(b) for the BOP.

---

[12]    Examination of the Sentencing Reform Act as a whole shows that "imprisonment," as stated in section 3621(b), is to be distinct from two the other types of sentences or aspects of sentences, such as probation, a fine, or supervised release. Imprisonment covers a range of restrictions on the defendant's liberty, including time spent on furlough, *see* 18 U.S.C. § 3622, and time spent in home confinement . *See* 18 U.S.C. § 3624(c)).

The OLC's reliance upon cases which have interpreted section 5C1.1 in effect puts the cart before the horse. These cases did not attempt in any manner to reconcile section 5C1.1 with the BOP's interpretation of section 3621(b). All the cases cited by the OLC in its memorandum distinguish between "community confinement" and "imprisonment" based solely upon section 5C1.1. As noted above, section 5C1.1 does indeed limit the sentencing courts' ability to sentence a certain class of defendants and limits their ability to dictate the place (or type) of imprisonment. That is all that these cases can stand for. Just because the sentencing courts cannot place individuals in CCCs or home confinement except under certain limited circumstances does not mean that the BOP is similarly constrained – Congress delegated by statute this authority to the BOP, not to judges.

Even assuming that these cases did discuss the issue of the differing definitions of "imprisonment" set forth by the Sentencing Commission and the BOP, the Sentencing Commission's definition, as noted above, is not controlling and would be unauthorized since it is the BOP that is charged with interpreting section 3621(b). Cases that follow an unauthorized guidelines provision cannot justify it. If the Sentencing Commission was wrong in its efforts to define "imprisonment," the cases following it are just as wrong and cannot provide support for anything.

Section 3624(c) provides:

> The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement.

The OLC memorandum contends that permitting the BOP to directly commit individuals from the outset or whenever it deems appropriate to CCCs render the time limitation set forth in section 3624(c) "null with respect to community confinement." This is not so. First, this statute does not say anything about CCCs or even at "correctional facilities." It is a mandate to the BOP requiring (as indicated by the use of the word

1   "shall") that it provide to all prisoners serving terms of imprisonment an opportunity to reintegrate into the

2   community. 18 U.S.C. § 3624(c). Nowhere does the statute specify what sort of "conditions" it contemplates

3   affording to prisoners to provide this "reasonable opportunity to adjust to . . . re-entry into the community."

4

5   *See id.* The only thing that Congress did feel the need to include is express authorization to afford someone

6   home confinement as one type of condition. *Id.*   Thus, it appears that under the statute, Congress

7   contemplated different types of conditions for different inmates – home confinement "may be used" or the

8   BOP can employ any other "conditions that will afford the prisoner a reasonable opportunity to adjust to and

9   prepare for the prisoner's re-entry into the community," whether that be classes at the prison facility or

10  halfway house or a work program or work camp.[13]   The only limitation and it appears to exist to give BOP

11  some reprieve is that the BOP must only provide this benefit for the last 10% not to exceed six months of the

12  prisoner's term. *Id.*   The OLC's argument that allowing direct CCC placement renders the six-month

13  limitation in section 3624(c) null and void with respect to CCC placement would only be valid if the statute

14  specified CCC placement as the only type of "condition" contemplated to re-integrate prisoners into the

15  community.   Because it set forth broad parameters for these "conditions" and by denoting "home

16  confinement" as one such condition necessarily envisioned a broader range of "conditions" than CCC

17  placement alone.

18      BOP's own Program Statements have always recognized, neither this statutory encouragement to the

19  BOP to facilitate the process of pre-release nor its limitations has any bearing on the general designation

20  authority. *See* Program Statement No. 7310.01 (The Bureau of Prisons interprets section 3621(b) and section

21  3624(c) as allowing it to designate inmates to community corrections center confinement for more than the

---

[13] This approach is entirely consistent with certain classes of inmates serving sentences at CCCs – those inmates could have their conditions of reporting, curfew, visitation, work, etc., made less stringent under section 3624(c) or they could serve the last 10% of their sentence in "home confinement" as per the statute. Thus, the mission of the statute is fulfilled and its terms are in no way rendered null and void.

last ten per cent, or more than six months, of their remaining sentence).  The Bureau of Prisons has always interpreted sections 3621(b) and 3624(c) in tandem "as allowing it to designate inmates to community corrections center confinement **for more than the last ten per cent, or more than six months, of their remaining sentence.**" Program Statement No. 7310.01 (emphasis supplied); *see United States v. Morales-Morales*, 985 F. Supp. 229, 231 (D.Puerto Rico 1997) (emphasis supplied).  In light of the clear history of section 3621(b), it is unreasonable to read section 3624(c) -- which governs pre-release CCC placement -- as restricting the authority of the BOP to utilize the community corrections component of a CCC for initial designations.

## E.  Policy Considerations

There are also important policies which serve the BOP, the community and individual prisoners' needs which will be foresworn entirely if the BOP is permitted to interpret section 3621(b) in this erroneous manner.  First, a host of programs have sprung up and have flourished over the years in direct response to the BOP's desire to place individuals into these CCCs or "correctional facilities."  *See* Program Statement 7310.04 (12/16/98), Exhibit D (BOP states it has CCCs designed for inmate placement "throughout the United States").  On a nationwide basis, there are innumerable halfway house facilities, work programs, and of course, the MINT (Mothers & Infants Together) program, which presumably is not exempted from the new "procedure change."  In the San Diego area alone, the halfway house facilities are numerous and there is even a specialized work program, the Urban Work Cadre and the Pacific Furlough Facility.  All of these will have to be disbanded if the BOP cannot fully utilize them.[14]

## F.  The BOP's New "Procedure Change" Violates the APA.

Congress clearly intended that the protections of the section 553 of the Administrative Procedure Act ("APA") apply to the rule-making authority of the BOP.  *See* 18 U.S.C. § 3625 (delineating sections 554, 555

---

[14] The undersigned believes that the Urban Work Cadre program is currently being dismantled as a direct result of the BOP's "new" interpretation of section 3621(b).

and 701 of the APA as inapplicable to "the making of any determination, decision or order under this subchapter").[15]  Title 5, section 553 requires that the BOP provide at least 30 days for notice and comment before putting this "procedure change" into effect.  5 U.S.C. §§ 553(b) & (c).  The BOP failed to comply with this statute.  This "procedure change" went into effect on December 20, 2002 and redesignations had already occurred before that date.  Thus, the BOP also violated 5 U.S.C. § 553(d), which provides that the publication for notice and comment purposes to occur "not less than 30 days before the [substantive rule's] effective date.  5 U.S.C. § 553(d).  No statutory exception exists to excuse the BOP's failure to comply with the statute's notice and comment and delayed effective date requirements.  Ms. Benton has been adversely effected by the unlawful implementation of this "procedure change."

The BOP cannot avoid the strictures of the APA by claiming that this "procedure change" is some sort of "interpretive rule."[16]  *See, e.g., Pickus v. United States Bd. of Parole*, 507 F.2d 1107, 1112 (D.C.Cir.1974) (The label an agency attaches to its pronouncement is clearly not dispositive); *Prows v. Department of Justice*, 704 F.Supp. 272, 274 (D.D.C.1988), *aff'd on other grounds*, 938 F.2d 274 (D.C.Cir.1991) (same).

The APA defines a "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . " 5 U.S.C. § 551(4).  Rule-making is defined as the "agency process for formulating, amending, or repealing a rule . . . " 5 U.S.C. § 551(5).  Thus defined, this "procedure change" is a clear example of agency rule-making.  Its scope affects not just one prisoner, but all prisoners.  It does not involve the application of a regulation

---

[15]  Arguably, the entire APA applies to the rule-making authority of the BOP, *see* S. Rep. No. 98-225 at 149 n. 363 (1984), *reprinted in* U.S.C.C.A.N. 3182, 3332 ("The APA continues to apply to the rule-making authority of the Bureau of Prisons"), and it is only the individual determinations which are not subject to the APA.  *See id.*

[16]  5 U.S.C. § 553(b)(3)(A) (Legislative rules must undergo notice and comment procedures;  interpretive rules need not).

1  to a particular set of facts, but, rather, seeks to establish guidelines applicable to a wide range of situations.

2  Accordingly, the APA applies here.

3

4  Because this new change imposed new restrictions upon inmates, sentencing judges and the BOP

5  itself, it is a legislative rule subject to the notice and comment. *See Shalala v. Guernsey Memorial Hosp.*,

6  514 U.S. 87 (1995) (dicta stating that APA rule-making would be required if a policy statement "adopted a

7  position inconsistent with any of the Secretary [of Health and Human Services'] existing regulations");

8  *Fairfax Nursing Ctr., Inc. v. Califano*, 590 F.2d 1297, 1301 (4th Cir.1979) ("The Secretary is not free to

9  promulgate regulations and then change their meaning by 'clarifications' or 'interpretations' issued without

10

11  formal notice and comment.   To do so would frustrate the policies of fair notice and comment in the

12  Administrative Procedure Act.").

13

14  **G.  Pursuant To The Well-Settled Presumption Against Retroactivity, the Bureau of Prisons Cannot Retroactively Apply a Revised Policy Contrary to Settled Expectations.**

15  The Supreme Court originally set out its prescription against *ex post facto* laws in *Calder v.*

16  *Bull*, 3 Dall. 386, 390 (1798), as directly adopted from the English common law.  In *Calder*, Justice Chase

17  set out four categories of criminal laws that are barred by the *ex post facto* doctrine.  The third of these

18  categories were "every law that changes the punishment, and inflicts a greater punishment, than the law

19

20  annexed to the crime, when committed." *Id.*

21  In the wake of *Calder*, the Supreme Court consistently has embraced this rule, finding that a

22  primary function of the Ex Post Facto Clause of the Constitution "is to bar enactments which by retroactive

23  operation, increase the punishment for a crime after its commission." *Garner v. Jones*, 529 U.S. 244 (2000).

24

25  *See also Collins v. Youngblood*, 497 U.S. 37, 42 (1990) (citing *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925)).

26  Instructively, the Supreme Court has addressed this issue in the context of changed laws affecting an inmates's

27  opportunity to be granted parole, and has found on a few occasions that such changes violated the Ex Post

28  Facto Clause. *See Lynce v. Mathis*, 519 U.S 433, 445-46 (1997) (citations omitted).

In *Fenner v. United States Parole Comm'n*, 251 F.3d 782 (9th Cir. 2001), the court agreed with the reasoning of the Eleventh Circuit, quoting: "[a]s a general rule, '[i]n determining the terms of a sentence, it is the intent of the sentencing judge which controls and that intent is to be determined by reference to the entire record.'" *Id.* at 786 (quoting *United States v. Bull*, 214 F.3d 1275, 1279 (11th Cir. 2000) (other citations omitted)). Additionally, the *Fenner* Court found that where there is ambiguity in the nature of the sentence, "[t]he intent of the sentencing court must guide any retrospective inquiry." *Id.* (quoting *United States v. Taylor*, 47 U.S. F.3d 508, 511 (2d Cir. 1995) (internal quotation marks omitted.); *see also Johnson v. Williford*, 682 F.2d 868, 871 (9th Cir. 1982) (applying principles of equitable estoppel against government to preclude retroactive denial of parole to previously deemed eligible inmate).

Notwithstanding any constitutional issue, courts have refused to apply new departures in statutory construction which overturn longstanding interpretations upon which settled expectations have developed, retroactively. In *Cort v. Crabtree*, 113 F.3d 1081 (9th Cir. 1997), and *Bowen v. Hood*, 202 F.3d 1211 (9th Cir. 2000), the Ninth Circuit rejected the BOP's retroactive application of regulations and program statements. *Cort* dealt with a situation strikingly similar to Ms. Benton's. There, the BOP changed its interpretation of "nonviolent offense" for the purposes of determining whether inmates who were either enrolled in or had completed the BOP's drug treatment program were eligible for early release. In *Cort*, the BOP did not issue a new regulation pertaining to the definition of "nonviolent offense." Rather, the BOP altered its interpretation and attempted to apply its new interpretation retroactively, thus denying certain inmates the benefit of early release despite the fact that they had been previously screened and informed that they were eligible for early release after completing the drug program. The Ninth Circuit held that the BOP had erred in applying this new definition retroactively. Citing Supreme Court case law, the *Cort* Court emphasized the "important presumption against retroactivity," finding that the presumption is "deeply rooted in our jurisprudence" and "embodies a legal doctrine centuries older than our Republic." *Cort*, 113 F.3d at 1084

24

1  (quoting *Langraf v. USI Film Products,* 511 U.S. 244, 265 (1994)) (internal quotation marks omitted).  In

2  finding that the BOP could not apply this new definition to inmates who had the expectation to be granted

3  early release due to their participation in the treatment program, *Cort* pointed out that "even where the Ex Post

4  Facto Clause is not formally applicable, 'prospectivity remains the appropriate default rule.'" Id. (quoting

5

6  *Langraf,* 511 U.S. at 272); *see also Bowen* 202 F.3d. at 1220-21 (disallowing BOP to deny benefits

7  retroactively: "[a]n agency cannot provide participants with a determination of eligibility based on the

8  purported examination of objective criteria, then subsequently deny them eligibility by exercise of whim." *Id.*

9

10  at 1220-21.[17]

11  <center>**V. REQUESTED RELIEF**</center>

12          For the reasons stated above, a writ of habeas corpus should issue invalidating the BOP's new

13  interpretation of 18 U.S.C. § 3621(b), enjoining the BOP from requiring Ms. Benton to serve her sentence at

14

15  FCI, Victorville rather than the CCC alternative recommended by the sentencing court.   Alternatively, she

16  seeks a resentencing where the objectives of the sentencing judge can be achieved and she can receive a

17  sentence which permits her to serve the five months at a CCC, as was permissible under the Sentencing

18  Guidelines and the BOP's interpretation of section 3621(b) and for such other and further relief as this Court

19  may deem just and proper.

20

21

22                                              Respectfully submitted,

23          Dated:  February 7, 2003

24                                              SHEREEN J. CHARLICK
                                                Federal Defenders of San Diego, Inc.
25                                              Attorneys for Petitioner Deborah Benton

26  _____

27          [17] As noted in our accompanying petition for a preliminary injunction seeking to enjoin
        the BOP from requiring that Ms. Benton serve her sentence at a penal facility as opposed to a
28  CCC, several other courts, including the Ninth Circuit, have either stayed the transfers of
        prisoners or extended self-surrender dates of other individuals pending determination of the
        legality of the BOP's actions. *See,* Preliminary Injunction Application at p. 4.

<center>25</center>

# EXHIBIT "A"

AO 245B (Rev. 9/00) Judgment in a Criminal Case
Sheet I

# UNITED STATES DISTRICT COURT

FILED

02 DEC 27 AM 11:54

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | (For Offenses Committed On or After November 1, 1987) |
| DEBORAH E. BENTON (1) | Case Number: 02CR2229-BTM |
| | SHEREEN CHARLICK, FED DEF INC. |
| | Defendant's Attorney |

**REGISTRATION NO.**    00972-068

**THE DEFENDANT:**

X   pleaded guilty to count(s)    ONE OF THE INDICTMENT.

☐   was found guilty on count(s) _____
      after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| Title & Section | Nature of Offense | Count Number(s) |
|---|---|---|
| 18 USC 1341 & 18 USC 2 | MAIL FRAUD AND AIDING AND ABETTING | 1 |

The defendant is sentenced as provided in pages 2 through ___5___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐   The defendant has been found not guilty on count(s) _____

☐   Count(s) _____ ☐ is ☐ are   dismissed on the motion of the United States.

X   Assessment :Pursuant to 18 USC 3013 an assessment is hereby levied in the amount of $100.00 which shall be due within the first year of supervised release.

X   Fine ordered waived.

        IT IS ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

DECEMBER 23, 2002
Date of Imposition of Sentence

BARRY TED MOSKOWITZ
UNITED STATES DISTRICT JUDGE

Entered Date:  1-2-03

02CR2229

Judgment — Page ___2___ of ___5___

DEFENDANT:        DEBORAH E. BENTON
CASE NUMBER:      02CR2229-BTM

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of
FIVE (5) MONTHS.

*Barry Ted Moskowitz*

BARRY TED MOSKOWITZ
UNITED STATES DISTRICT JUDGE

X   The court makes the following recommendations to the Bureau of Prisons:
THAT THE DEFENDANT PARTICIPATE IN URBAN WORK CAMP.

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐   as notified by the United States Marshal.

X   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    X   by 12:00 noon on February 21, 2003 or this court by 2:00 p.m.

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

02CR2229

Judgment—Page <u>3</u> of <u>5</u>

DEFENDANT: DEBORAH E. BENTON
CASE NUMBER: 02CR2229-BTM

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of  three (3) YEARS.

## MANDATORY CONDITIONS

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons unless returned to Mexico.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, unless defendant is returned to Mexico.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.

The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court . The defendant shall also comply with any special conditions imposed.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

02CR2229

Judgment—Page ___4___ of ___5___

DEFENDANT:        DEBORAH E. BENTON
CASE NUMBER:      02CR2229-BTM

## SPECIAL CONDITIONS OF SUPERVISION

_X_ Submit to a search of person, property, residence, abode or vehicle, at a reasonable time and in a reasonable manner, by the probation officer.

_X_ Not possess firearms, explosive devices, or other dangerous weapons.

_X_ Not possess any narcotic drug or controlled substance without a lawful medical prescription.

_X_ Make restitution to High Mark Blue Cross-Blue Shield in the amount of $31,312.50, to be paid in installments of $100.00 per month, subject to increase or decrease on change of circumstances. The defendant shall provide a promissory note to High Mark Blue Cross-Blue Shield for the balance due 60 days prior to termination of supervised release. Restitution is joint and several with Dr. Lloyd Henry Bell.

_X_ Report all vehicles owned or operated, or in which you have an interest, to the probation officer.

_X_ Be prohibited from opening checking accounts or incurring new credit charges or opening additional lines of credit without approval of the Probation Officer.

_X_ Provide complete disclosure of all personal and business financial records to the probation officer when requested.

___ Participate in a program of mental health treatment as directed by the probation officer, take all medications as prescribed by a psychiatrist/physician, and not discontinue any medications without permission. The Court authorizes the release of the pre-sentence report and available psychological evaluations to the mental health provider, as approved by the probation officer. The defendant shall consent to the release of evaluations and treatment information to the probation officer and the Court by the mental health provider.

_X_ Remain in your place of residence for a period of 150 days, except while working at verifiable employment, attending religious services or undergoing medical treatment or performing community service.

___ Not associate with known alien smugglers.

___ Not associate with known drug traffickers or users.

___ Not enter the Republic of Mexico without the written permission of the probation officer.

_X_ Maintain full-time employment or education or a combination of both.

02CR2229

DEFENDANT:  DEBORAH E. BENTON
CASE NUMBER:  02CR2229-BTM

## RESTITUTION

Make restitution to High Mark Blue Cross-Blue Shield in the amount of $31,312.50, to be paid in installments of $100.00 per month, subject to increase or decrease on change of circumstances.  The defendant shall provide a promissory note to High Mark Blue Cross-Blue Shield for the balance due 60 days prior to termination of supervised release. Restitution is jointly and severally with Dr. Lloyd Henry Bell.

02CR2229

Federal Bureau of Prisons

*Washington, DC 20534*

January 24, 2003

Mark R. Rehe
Assistant United States Attorney
Southern District of California
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101-8893

Re: Jay Woodrow Thorn, Register Number 82365-198

Dear Mr. Rehe:

    The Bureau of Prisons (BOP) originally designated Jay
Woodrow Thorn, Register Number 82365-198, to the Pacific Furlough
community corrections center in San Diego, California.  Mr. Thorn
was recently notified that he was going to be re-designated to
the Metropolitan Correctional Center (MCC) in San Diego,
California.  The Department of Justice has reconsidered the facts
and circumstances surrounding Mr. Thorn's re-designation.
Consequently, he will not be transferred to MCC San Diego.  Mr.
Thorn will complete his sentence at the halfway house where he is
currently confined.

                  Sincerely,

                  Kathleen M. Kenney
                  Deputy General Counsel

cc: Shereen J. Charlick, Esquire
    Robert Haro, Regional Director

# EXHIBIT "B"

**U.S. Department of Justice**

**Federal    Bureau    of    Prisons**

---

Community Corrections

234 North Central Avenue
Suite 425
Phoenix, Arizona 85004

**FILED**

DEC 3 1 2002

CLERK, U.S./DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

December

The Honorable Manuel L. Real
United States District Judge
United States District Court for the
Southern District of California
940 Front Street
San Diego, CA 92101

Re:   **Jay Woodrow Thorn**
      **Court Docket Number 02CR0729-MLR**

Dear Judge Real:

This letter informs you of a recent Bureau of Prisons' (Bureau) procedure change which impacts Mr. Thorn (Register Number 82365-198), who was sentenced by your court.

The Bureau has had a practice of honoring some judicial recommendations to place inmates in community correction centers (CCC) for the imprisonment portions of their sentences. Effective immediately, however, this practice will no longer be followed. The Bureau will not use CCCs as a substitute for imprisonment.

This procedure change follows recent guidance from the U.S. Department of Justice's Office of Legal Counsel (OLC), finding that the term "community confinement" is not synonymous with "imprisonment." OLC has determined that the Bureau's practice of using CCCs as a substitute for imprisonment contravenes well-established caselaw, and is inconsistent with U.S.S.G. § 5C1.1.

This procedure change will be implemented prospectively, with the following exception. Inmates directly designated to CCCs who, as of December 16, 2002, had more than 150 days remaining to serve on their prison terms, will be re-designated by the Bureau to prison institutions. Because Mr. Thorn falls into this group, he will be re-designated to a prison institution within the next 30 days in compliance with the procedure change. Mr. Thorn will then be reviewed for CCC placement pursuant to the Bureau's limited pre-

release designation authority found at 18 U.S.C. § 3624(c).

     For further information or discussion of this situation, please call me directly at (602) 379-4947 or Mr. Harlan Penn, Regional Counsel at (925) 803-4700.


Sincerely,


Leonard J. Lipsutz
Community Corrections Manager

2



**U.S. Department of Justice**

Federal Bureau of Prisons

_Office of the Director_                    _Washington, DC 20534_

December 20, 2002

MEMORANDUM FOR FEDERAL JUDGES

FROM:          Kathleen Hawk Sawyer
               Director

SUBJECT:       Community Confinement Procedure Change

   This memorandum informs you that the Bureau of Prisons
(Bureau) is implementing a significant procedure change regarding
inmate designations to community correction centers (CCC) (also
known as "halfway-houses").  The Bureau has had a practice of
honoring some judicial recommendations to place inmates in CCCs
for the imprisonment portions of their sentences.  Effective
immediately, this practice will no longer be followed. The Bureau
will not use CCCs as a substitute for imprisonment.

   This procedure change follows recent guidance from the U.S.
Department of Justice's Office of Legal Counsel (OLC), finding
that the term "community confinement" is not synonymous with
"imprisonment."  OLC has determined that the Bureau's practice of
using CCCs as a substitute for imprisonment contravenes well-
established caselaw, and is inconsistent with U.S.S.G. § 5C1.1.

   This procedure change will be implemented prospectively,
with the following exception.  Inmates designated to CCCs who, as
of December 16, 2002, had more than 150 days remaining to serve
on their prison terms, will be re-designated by the Bureau to
prison institutions.



**U.S. Department of Justice**

Federal Bureau of Prisons

Washington, D.C. 20534
December 20, 2002

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM: | /s/
Michael B. Cooksey, Assistant Director
Correctional Programs Division

/s/
Christopher Erlewine
Assistant Director/General Counsel

SUBJECT:    Community Confinement Procedure Changes

This memorandum informs you of procedure changes related to the Bureau's designation of inmates to community correction centers (CCC) to serve terms of imprisonment.  These procedure changes are the result of a recent legal opinion issued by the U.S. Department of Justice, Office of Legal Counsel (OLC), which analyzes the Bureau's statutory authority to designate inmates to CCCs as more limited than we have previously practiced.  A copy of the OLC opinion is included with this memorandum.

**This memorandum should be distributed to all staff who are affected by the procedure changes.**

For further implementation assistance, please contact Stew Rowles, Community Corrections Administrator, at , or J.Paul Horner, Administrator, Correctional Programs Branch, .  For staff legal assistance, please contact your Regional Counsel.  Advise inmates wishing to challenge any aspect of this revised procedure to do so through the Bureau's administrative remedy program.

3a

## THE BUREAU'S CCC DESIGNATION AUTHORITY DEFINED

Effective immediately, the Bureau's CCC designation authority is defined as follows:

(1) **The Bureau will no longer accommodate judicial recommendations for direct CCC placement of inmates sentenced to terms of imprisonment** (hereinafter referred to as "direct-court placement inmates"). Rather, all inmates serving terms of imprisonment must be designated by the Bureau to prison or jail facilities. This prohibition applies to all U.S. Code and D.C. Code offenders whose prison sentences are administered by the Bureau; and

(2) **Pre-release programming CCC designations are limited in duration to the last 10% of the prison sentence, not to exceed six months.** This limitation, and the following two exceptions, apply to all U.S. Code and D.C. Code offenders whose prison sentences are administered by the Bureau:

   - Inmates completing the Residential Drug Abuse Program (RDAP) may exceed the 10% limitation, but are still limited to a maximum six-months pre-release CCC designation; and

   - Inmates completing an Intensive Confinement Center (ICC) program may exceed both the 10% and six-months limitations, at this time. The OLC opinion's impact on this issue is still being reviewed, and further guidance will be forthcoming.

## IMPLEMENTATION PROCEDURES

There are three phases to implementing these procedure changes. First, some direct-court placement inmates must be promptly re-designated to prison or jail facilities depending on the amount of time left to serve on their prison terms. Second, future pre-release CCC designation cases must be immediately reviewed to ensure compliance with this revised procedure before the inmates depart their parent institution. Third, female inmates participating in the Mothers and Infants Nurturing Together (MINT) program will be authorized by furloughs rather than CCC designations.

- 2 -

2,b

**Re-Designation of Direct-Court Placement Inmates.**

Direct-court placement inmates who, as of December 16, 2002, had more than 150 days left to serve on their prison sentences, must be re-designated to prison or jail facilities.  This calculation results in a date of May 15, 2003.  **Accordingly, direct-court placement inmates who, as of December 16, 2002, had a projected release date of May 15, 2003, or later, must be re-designated to prison or jail facilities.**

Rosters identifying these inmates are attached.  However, each community corrections office (CCO) needs to thoroughly review the direct-court placement inmate population to ensure compliance with this directive.  CCO staff will need to closely review each identified case to ensure that the individual inmate is actually residing in a CCC, rather than a prison or jail facility, and if so, to determine the appropriate transfer method to the re-designated facility.  CCOs should work closely with Regional Designators to secure placement at the nearest appropriate facility.

Also, when re-designating direct-court placement inmates to prison or jail facilities:

(1)  Notify the sentencing judge of the inmate's re-designation.  A sample letter for your use is included with this memorandum; and

(2)  Provide the inmate written notice of the re-designation at least 30 days prior to being transferred.  A sample memorandum for your use is included with this memorandum.  At least 30 days must pass between the date the inmate receives the written notice, and the actual transfer.

**Pre-Release CCC Inmates.**

The individual cases of all inmates being considered for pre-release CCC placement must be immediately reviewed for compliance with this revised procedure.  Inmates who, at the time of record review by Bureau staff pursuant to this memorandum, have not yet departed their parent institutions en route to the CCC, must have their pre-release CCC designation plan adjusted accordingly to comply with this revised procedure, i.e., limited in duration to the last 10% of the prison sentence, not to exceed six months.

- 3 -

3c



U.S. Department of Justice

Office of Legal Counsel

---

Office of the Principal Deputy Assistant Attorney General     *Washington, D.C 20530*

December 13, 2002

## MEMORANDUM FOR LARRY D. THOMPSON
### DEPUTY ATTORNEY GENERAL

*Re: Bureau of Prisons practice of placing in community confinement*
*certain offenders who have received sentences of imprisonment*

Your office has informed us that when a federal offender whom the Bureau of Prisons ("BOP") deems to be low-risk and nonviolent receives a short sentence of imprisonment, BOP often places that offender in a community corrections center, halfway house, or other form of "community confinement," rather than in prison. Your office has asked us to advise you whether BOP has general authority, either upon the recommendation of the sentencing judge or otherwise, to place such an offender directly in community confinement at the outset of his sentence or to transfer him from prison to community confinement during the course of his sentence.

We conclude below that BOP has no such general authority. As we explain, BOP's statutory authority to implement sentences of imprisonment must be construed, wherever possible, to comport with the legal requirements that govern the federal courts' sentencing orders. Community confinement does not constitute imprisonment for purposes of a sentencing order, and BOP lacks clear general statutory authority to place in community confinement an offender who has been sentenced to a term of imprisonment. BOP's practice is therefore unlawful.

### I.

We begin by examining whether federal courts have authority under the Sentencing Guidelines to order that the types of sentences at issue here be satisfied by community confinement.

### A.

The authority to sentence federal offenders to terms of imprisonment rests with the federal courts under the provisions of the Federal Criminal Code and the Sentencing Guidelines promulgated thereunder. *See* 18 U.S.C. §§ 3553, 3581-3582 (2000); *Williams v. United States,* 503 U.S. 193, 200-01 (1992). The Sentencing Guidelines were promulgated by the U.S. Sentencing Commission pursuant to the mandate of the Sentencing Reform Act of 1984, which

4

sought to eliminate arbitrary discrepancies in federal sentencing.[1]  Subject to the court's authority to depart from Guideline sentencing ranges when certain criteria are satisfied, *see* 18 U.S.C. § 3553(b), federal courts are bound by the provisions of the Sentencing Guidelines when they impose sentences on federal offenders. *See Koon v. United States*, 518 U.S. 81, 92 (1996); *Stinson v. United States*, 508 U.S. 36, 42 (1993).

The Sentencing Guidelines contain base offense levels of increasing severity (from level 1 to level 43), depending upon the seriousness of the offense and the characteristics of the offender with respect to specified criteria.  The sentencing ranges applicable to the respective offense levels are set forth in a Sentencing Table that is published with the Guidelines.  The Sentencing Table is divided into four different Zones, ranging from Zone A (for the shortest sentences) to Zone D (for the most severe sentences).

The BOP practice at issue here applies to Zone C and Zone D sentences.  Zone C encompasses base offense levels 11 and 12 which, in the case of offenses falling into Criminal History Category I (the most favorable criminal history category), establish sentencing ranges of 8 to 14 months of imprisonment and 10 to 16 months of imprisonment, respectively.  Zone D demarcates permissible sentences for base offense levels 13 through 43 and, again assuming Criminal History Category I, provides for a sentencing range of 12 to 18 months of imprisonment for offense level 13, and up to life imprisonment for offense level 43.[2]

For Zone C sentences, section 5C1.1(d) of the Guidelines provides that the minimum term may be satisfied either by a simple "sentence of imprisonment," U.S. Sentencing Guidelines Manual § 5C1.1(d)(1), or by a "sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention," *Id.* § 5C1.1(d)(2).  In the latter case (sometimes referred to as a "split sentence"), section 5C1.1(d) requires "that at least one-half of the minimum term [be] satisfied by imprisonment." *Id.*  The Guidelines state that "community confinement" "means residence in a community treatment center, halfway house, restitution center, mental health facility, alcohol or drug rehabilitation center, or other community facility; and participation in gainful employment, employment search efforts, community service, vocational training, treatment, educational programs, or similar facility-approved programs during non-residential hours." *Id.* § 5F1.1, Application Note 1.

For Zone D sentences, section 5C1.1(f) requires that the minimum term be satisfied by a simple sentence of imprisonment. U.S.S.G. § 5C1.1(f).

---

[1] *See* Pub. L. No. 98-473, Title II, Ch. II, § 217, 98 Stat. 1837, 2017 (1984), reprinted in 1984 U.S.C.C.A.N. 1837, 2017.

[2] United States Sentencing Commission, *Guidelines Manual*, Sentencing Table (Nov. 2001).

## B.

By its plain terms, section 5C1.1 provides only limited authority to a federal court to order that a Zone C sentence of imprisonment be satisfied by community confinement. In particular, it provides only that a federal court may impose a Zone C split sentence under which the sentence of imprisonment "includes a term of supervised release with a condition that substitutes community confinement or home detention . . . , provided that at least one-half of the minimum term is satisfied by imprisonment." U.S.S.G. § 5C1.1(d)(2). With respect to Zone C or Zone D simple sentences of imprisonment, section 5C1.1 provides no authority to substitute community confinement for any portion of the sentence.

Consistent with the plain meaning of section 5C1.1, the federal courts of appeals have uniformly determined that community confinement does not constitute "imprisonment" for purposes of satisfying either the requirement under that section that "at least one-half of the minimum term [of a Zone C split sentence] be satisfied by imprisonment" or the requirement that a Zone C or Zone D simple sentence be a "sentence of imprisonment." In the words of the Second Circuit, "'Imprisonment' and 'community confinement' are not synonyms. 'Imprisonment' is the condition of being removed from the community and placed in prison, whereas 'community confinement' is the condition of being controlled and restricted within the community." *United States v. Adler*, 52 F.3d 20, 21 (2d Cir. 1995). The Seventh Circuit has likewise stated that section 5C1.1 "plainly draws a distinction between 'imprisonment' and either community confinement or home detention" and that this distinction "is consistent with the plain meaning of the term 'imprisonment.'" *United States v. Swigert*, 18 F.3d 443, 445 (7th Cir. 1994). *See also United States v. Voda*, 994 F.2d 149, 152 (5th Cir. 1993) (stating, in construing Guidelines provision governing Zone B sentence of probation, that "a community corrections facility is not a jail"); *United States v. Latimer*, 991 F.2d 1509, 1513 (9th Cir. 1993) (stating, in construing Guidelines provision governing criminal history, that "the division between imprisonment and community treatment center confinement is emphasized again in §5C1.1").[5]

In *United States v. Serafini*, 233 F. 3d 758 (3rd Cir. 2000), the Third Circuit opined that where the district court had imposed on the defendant a Zone C 10-month split sentence, consisting of five months of imprisonment and five months of house arrest, the district court would violate the Guidelines if it ordered that the defendant serve the five months of imprisonment in community confinement. *Id.* at 762 n.2, 777-778. Determining that the district court had merely recommended (rather than ordered) community confinement, the Third Circuit stated that BOP would violate the Guidelines if it followed the district court's recommendation. *Id.* at 778. It further emphasized that "a district court has *no* power to *dictate* or *impose* any

---

[5] Contrary to *Latimer* and *United States v. Pielago*, 135 F.3d 703, 711-713 (11th Cir. 1998), the Sixth Circuit in *United States v. Rasco*, 963 F.2d 132 (6th Cir. 1992), ruled that, for purposes of the Guidelines provision governing criminal history, detention in a halfway house or community treatment center constitutes "being incarcerated." The Sixth Circuit made clear, however, that its ruling had no application to section 5C1.1. *See Id.* at 137.

place of confinement for the imprisonment portion of the sentence." *Id.* at 778 n.23 (emphasis in original). Similarly, the Sixth Circuit ruled that where the district court had sentenced a defendant "to be imprisoned for a term of ten months," the district court could not substitute community confinement for imprisonment. *United States v. Jalili*, 925 F.2d 889, 892-893 (6th Cir. 1991). Language in the court's order purporting to make this substitution was instead to be "stricken from the order as mere surplusage." *Id.* at 893.[4]

In sum, it is clear that federal courts violate the Guidelines if they order that (1) an offender sentenced to a Zone C or Zone D simple sentence of imprisonment serve his sentence in community confinement, or (2) that an offender sentenced to a Zone C split sentence serve the imprisonment portion of his sentence in community confinement.

## II.

Having determined that a federal court violates the Guidelines if it orders that a sentence of imprisonment be satisfied by community confinement, we now address whether BOP, either on its own initiative or in response to a federal court recommendation, has general authority to implement a Zone C or Zone D sentence of imprisonment by placing an offender in community confinement.

## A.

The Sentencing Reform Act of 1984 not only authorized the Sentencing Guidelines; it also rewrote the provisions governing BOP's implementation of sentences.[5] Under section 3621 of title 18, BOP is responsible for administering the sentences of imprisonment that federal courts impose on federal offenders:

> (a) COMMITMENT TO CUSTODY OF BUREAU OF PRISONS. – A person who has been sentenced to a term of imprisonment pursuant to the provisions of subchapter D of chapter 227 shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of section 3624.

> (b) PLACE OF IMPRISONMENT. – The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may desig-

---

[4] The Sixth Circuit did rule in *United States v. Strozier*, 940 F.2d 985 (6th Cir. 1991), that, for purposes of a Guidelines provision requiring that a court "order a term of supervised release to follow imprisonment when a sentence of imprisonment of more than one year is imposed," the period of community confinement should be included in determining the length of the sentence of imprisonment. Both the Sixth and Seventh Circuits have determined, however, that that ruling on a separate Guidelines provision should not guide the meaning of section 5C1.1. *See Rasco*, 963 F.2d at 137; *Swigert*, 18 F.3d at 446.

[5] *See* Pub. L. No. 98-473, Title II, Ch. II, §§ 212, 217, 98 Stat. 1837, 1987, 2007, 2017 (1984).

7

nate any available penal or correctional facility that meets the minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering –

(1) the resources of the facility contemplated;

(2) the nature and circumstances of the offense;

(3) the history and characteristics of the prisoner;

(4) any statement made by the court that imposed the sentence –

(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

(B) recommending a type of penal or correctional facility as appropriate; and

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

18 U.S.C. § 3621 (2000). In addition, section 3622 authorizes BOP to "release a prisoner from the place of his imprisonment for a limited period" under specified conditions for purposes that include employment, training, and education. *Id.* § 3622. Section 3624(c) further provides that BOP "shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community." 18 U.S.C. § 3624(c) (2000). It also specifies that "home confinement" may be used for this purpose. *See id.*

**B.**

Both BOP's authority under title 18 to implement sentences of imprisonment and the federal courts' sentencing authority under the Guidelines were conferred by the Sentencing Reform Act of 1984. It is therefore especially appropriate that they be construed to produce a harmonious interpretation. *See, e.g., Reno v. Koray*, 515 U.S. 50, 56-57 (1995). Because BOP is merely administering the sentences of imprisonment that the federal courts impose pursuant to the Guidelines, we believe that BOP's authority must be construed, wherever possible, to comport with the legal requirements that govern the sentencing orders. Construing BOP's authority in this way will also promote Congress's objective of eliminating arbitrary disparities in punishment between offenders convicted of the same offense. *See supra* pp. 1-2 & n.1.

5

8

We recognize that there are certain provisions governing BOP's implementation of sentences of imprisonment that clearly authorize a sentence to be implemented other than according to its seemingly plain terms. In such cases, the rule of construction described above does not come into play because there is no conflict to be resolved. Rather, a harmonious interpretation is achieved in such cases by understanding the sentence to be read in light of, and therefore to incorporate implicitly, the clear statutory provision. For example, section 3621(a) specifies that an offender "who has been sentenced to a term of imprisonment . . . shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, *or until earlier released for satisfactory behavior pursuant to the provisions of section 3624*," 18 U.S.C. § 3621(a) (emphasis added). Section 3624(a) in turn provides that a "prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment, *less any time credited toward the service of the prisoner's sentence*" for satisfactory behavior, *id.* § 3624(a) (emphasis added). In light of this clear statutory command, we have no doubt that a sentence imposed under the Sentencing Guidelines must be read as being subject to the command. Thus, where a prisoner serving a three-year sentence of imprisonment has received ten days' credit for satisfactory behavior, BOP, in administering the sentence, must release the offender ten days before the three-year period runs.

The question for us here, then, is whether BOP has clearly been given statutory authority to implement Zone C or Zone D simple sentences of imprisonment, or to implement the imprisonment portion of a Zone C split sentence, by placing an offender in community confinement. BOP has pointed to sections 3621(b) and 3622 as possible sources of authority. We address these in turn.

Nothing in section 3621(b) provides BOP clear authority to place in community confinement an offender who has been sentenced to a term of imprisonment. It is true that section 3621(b) gives BOP broad discretion to designate as "the place of the prisoner's imprisonment" "any available penal or correctional facility that meets minimum standards of health and habitability . . . [and] that [BOP] determines to be appropriate and suitable." But the authority to select the *place* of imprisonment is not the same as the authority to decide *whether* the offender will be imprisoned. Under the statutory scheme, the latter authority lies solely with the court (subject to the requirements imposed by the Sentencing Guidelines), and section 3621(b) does not authorize BOP to subvert that statutory scheme by placing in community confinement an offender who has received a sentence of imprisonment. Thus, even if we were to conclude that a community corrections center or halfway house could qualify as "the place of the prisoner's imprisonment" for purposes of this section, we would not read this general conferral of authority as speaking at all to -- much less clearly trumping -- the requirement under the Guidelines that community confinement not be used to satisfy a Zone C or Zone D simple sentence of imprisonment or the imprisonment portion of a Zone C split sentence. Moreover, if section 3621(b) were read to confer on BOP unfettered discretion to have offenders serve sentences of imprisonment in community confinement, then the time limitation in section 3624(c) on BOP authority to transfer a prisoner to a non-prison site – i.e., for a period, not to

6

9

exceed six months, of the last 10% of the term of his sentence – would be rendered null with respect to community confinement.[6]

In addition, consistent with the federal courts of appeals' reading of section 5C1.1, *see supra* p. 3, we do not believe that a community corrections center or halfway house is a "place of . . . imprisonment" within the ordinary meaning of that phrase. As we understand it, residents of a community corrections center or halfway house, although still in federal custody, are generally not confined to the facility throughout the day but are instead able to pursue outside employment, training, and education.[7] Indeed, as we understand BOP's policy statement on community corrections centers ("CCCs"), inmates placed in CCCs normally become eligible for weekend and evening leave passes after the second week of confinement. BOP PS 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedure, ¶ 7.a(1)-(2) (Dec. 16, 1998), *available at* http://www.bop.gov/progstat/7310_04.html. Reading section 3621(b) as a whole, therefore, we understand the discretion afforded to BOP, under the second sentence, to "designate any available penal or correctional facility that meets minimum standards of health and habitability . . . [and] that [BOP] determines to be appropriate and suitable" to be constrained by the requirement in the first sentence that such facility be a place of imprisonment.[8]

We acknowledge that section 3621(b)(4)(B) provides specifically that BOP may consider, in determining which penal or correctional facility to designate, a judicial statement

---

[6] Your office has advised us that BOP, in exercising its authority under section 3624(c), has sometimes not abided by the time limitation set forth in that section. The authority conferred under section 3624(c) to transfer a prisoner to a non-prison site is clearly limited to a period "not to exceed six months, of the last 10 per centum of the term to be served," 18 U.S.C. § 3624, and we see no basis for disregarding this time limitation.

[7] *See, e.g., Ibailor v. Salvation Army*, 51 F.3d 678, 683 (7th Cir. 1995) (describing freedom of residents of halfway house); *United States v. Chavez*, 204 F.3d 1305, 1315 (11th Cir. 2000) ("We have previously held that confinement to a halfway house at night with the requirement that a defendant work at a job or seek employment during the day is a liberty 'markedly different from custodial incarceration in a penitentiary.'" (citing *Dawson v. Scott*, 50 F.3d 884, 888 (11th Cir. 1995)); *United States v. Dighera*, 185 F.3d 875 (Table), 1999 WL 390870, at *2 (10th Cir. June 15, 1999) ("We have previously distinguished sentences involving physical confinement, such as incarceration at a prison camp, from non-secured custody such as placement at a halfway house."); *Richardson v. Steffa*, 105 F.3d 669 (Table), 1997 WL 10964, at *1 (10th Cir. Jan. 14, 1997) ("under the community corrections program, [plaintiff] was able to work in the Denver community at good jobs, travel about the community unescorted, and maintain business and social contacts").

[8] We assume *arguendo* that a community corrections center, halfway house, or other form of community confinement may constitute a "penal or correctional facility" under the provisions of 18 U.S.C. § 3621(b). We note, however, that that term is not defined. In a 1992 opinion in which we concluded that BOP has authority under section 3621 to contract with the private sector for the operation of secure facilities, we declined to draw a distinction between residential community facilities and secure facilities with respect to BOP's contracting-out authority. *See Statutory Authority to Contract with the Private Sector for Secure Facilities*, 16 Op. O.L.C. 65, 70-71 (1992). That opinion, however, did not address the distinct question whether a community corrections center constitutes a "place of imprisonment" under section 3621, nor did it have occasion to consider the line of cases discussed in Part I.B, *supra*, holding that community confinement does not constitute imprisonment.

7

10

"recommending a type of penal or correctional facility as appropriate." But any contention that this provision clearly indicates that BOP has authority to have an offender serve a sentence of imprisonment in community confinement depends on two mistaken premises – the premise that there are not various types of places of imprisonment, *but see* 28 C.F.R. § 500.1(d) (listing various types), and the premise that BOP is required to give effect to a judicial recommendation.

Section 3622, which provides for temporary release of prisoners, likewise does not provide clear authority to support BOP's practice. In particular, each of the subparts of section 3622 presupposes that an offender is in a "place of . . . imprisonment," and none authorizes extended placement of a prisoner in community confinement. Subsection 3622(a) permits release of a prisoner for no more than 30 days for various purposes, including attending to important family matters (e.g., attending a funeral or visiting a dying relative), obtaining medical treatment, or contacting a prospective employer. Subsection 3622(b), in authorizing the release of a prisoner to "participate in a training or educational program in the community," provides that the prisoner shall "*continu[e]* in official detention at the prison facility." And subsection 3622(c) provides that a prisoner who obtains temporary release for purposes of "paid employment," shall "*continu[e]* in official detention at the penal or correctional facility."

We therefore conclude that the BOP practice is not lawful.

● ● ●

In sum: When a federal offender receives a Zone C or Zone D sentence of imprisonment, section 3621 and section 3622 of title 18 do not give BOP general authority to place the offender in community confinement from the outset of his sentence. Nor do they give BOP general authority to transfer him from prison to community confinement at any time BOP chooses during the course of his sentence.

*M. Edward Whelan III*

M. Edward Whelan III
Principal Deputy Assistant Attorney General

8

/(



**FBOP Population Rises**



Sources: U.S. Bureau of Justice Statistics, Federal Bureau of Prisons, Texas Dept. of Criminal Justice, California Dept. of Corrections.

**Date:**    1/17/2003 3:22 PM
**Sender:** bopwatch@yahoogroups.com
**To:**     tbussert@bussertlaw.com
**bcc:**    Shereen Charlick
**Priority:** Normal
**Subject:** [BOPWatch] FBOP Emerges as Largest Prison System in U.S.
From the Correctional News:
http://www.correctionalnews.com/newsflash/printCurrent.html


fbop graph
<http://www.correctionalnews.com/newsflash/images/fbop.gif>
FBOP Emerges as Largest Prison System in U.S.

WASHINGTON - The Federal Bureau of Prisons (FBOP) has surpassed
California and Texas as the largest prison system in the United
States,
holding 164,011 prisoners as of November 7, according to recent
FBOP
population reports.

Reports from the California Department of Corrections (CDC) put
that
system's population at 161,387 on October 31, while Texas
Department of
Criminal Justice (TDCJ) officials calculated their population
to be
146,496 on November 6, the day before the FBOP's tallies.

"The emergence of the federal prison system as the nation's
largest
reflects a trend that has been underway for over two years,"
says Eli
Gage, publisher of  < http://www.correctionalnews.com/>
Correctional
News. "While individual states have been suspending prison
construction,
scaling back mandatory sentencing laws, and exploring
alternative
sentencing, the FBOP has continued to build, and build
quickly."

"The FBOP is growing just as rapidly as Texas is shrinking,"
said Gage.
Only two years ago, prison populations in Texas and California
exceeded
the FBOP's population of 142,530 by about 20,000 and 15,000
prisoners
respectively. The FBOP, since that time, has increased its
population by
more than 20,000 inmates.

None of this is surprising to industry observers. Scott
Higgins, design
and construction chief for the FBOP, announced in 2000 that the
Bureau
would build four to six new institutions a year for the next
several
years. For FY2001, the BOP received $883 million for facilities

nationwide.

The following year, the Bush administration proposed spending one
billion dollars for BOP construction and $31 million for INS detention
construction at a time when Federal prisons were significantly more
crowded than state prisons.

The Bureau tackled its aggressive construction schedule by committing
itself to the design-build delivery method, which accelerated the
bidding process. In addition, the Clinton administration opened the door
for the Bureau to rely heavily on private prison companies to both build
and operate its facilities, further reducing costs and accelerating
timelines.

The new federal prisons all appear very similar, using prototype
buildings that can be configured in various ways, based on site
conditions and security ratings. The new generation of facilities cost
an average of $110 million to build and can house 1,200
prisoners each.

"The prison-building boom of the 1990s has waned everywhere except at
the federal level. There are very few new prisons entering the
construction pipeline on the state level because budgets are tight and
the projects are unpopular with the public," says Gage. "The federal
prison construction boom may just be an echo of the earlier one, but at
this point, it seems likely the Bureau will remain the largest system,
perhaps into the next decade."

www.bop.gov/weekly.html
www.correctionalnews.com < http://www.correctionalnews.com/>

Law Office of Todd A. Bussert
87 Meadow Street
Naugatuck, CT 06770
(203) 723-2905; Fax: (203) 723-9250
 <http://www.bussertlaw.com/> www.bussertlaw.com


fbop.gif

# EXHIBIT "D"



U.S. Department of Justice
Federal Bureau of Prisons

# Program Statement

OPI:      CPD
NUMBER:   7310.04
DATE:     12/16/98
SUBJECT:  Community Corrections
          Center (CCC)
          Utilization and
          Transfer Procedure

1. <u>PURPOSE AND SCOPE</u>.  To provide guidelines to staff regarding
the effective use of Community Corrections Centers (CCCs).  This
Program Statement defines placement criteria for offenders,
requires that staff members start the placement process in a
timely manner, and defines the circumstances when inmates may
refuse Community Corrections (CC) programs.  It also establishes
an operational philosophy for CCC referrals that, whenever
possible, eligible inmates are to be released to the community
through a CCC unless there is some impediment as outlined herein.

CCCs provide an excellent transitional environment for inmates
nearing the end of their sentences.  The level of structure and
supervision assures accountability and program opportunities in
employment counseling and placement, substance abuse, and daily
life skills.

One reason for referring an inmate to a CCC is to increase public
protection by aiding the transition of the offender into the
community.  Participating in community-based transitional
services may reduce the likelihood of an inmate with limited
resources from recidivating, whereas an inmate who is released
directly from the institution to the community may return to a
criminal lifestyle.  While clearly dangerous inmates should be
separated from the community until completing their sentences,
other eligible inmates should generally be referred to CCCs to
maximize the chances of successful reintegration into society.

Finally, the scope of this Program Statement has been extended to
include CCC consideration/placement of District of Columbia
Department of Corrections inmates.

2.  PROGRAM OBJECTIVES.  The expected results of this program
are:

   a.  All eligible inmates will have opportunities to participate
in CCC programs to assist with their reintegration into the
community, in accordance with their release needs.

   b.  All inmates will have opportunities to communicate directly
with staff who make significant CCC referral recommendations.

   c.  Referral packets for CCC placement will be timely and
complete.

   d.  Before any inmate is transferred to a CCC, the CCC staff
will have the required notice and other documentation.

   e.  The public will be protected from undue risk.

3.  DIRECTIVES AFFECTED

   a.  Directive Rescinded

      PS 7310.03     Community Corrections Center (CCC)
                     Utilization and Transfer Procedures (3/25/96)

   b.  Directives Referenced

      PS 1434.06     Jurisdiction on Escape Related Issues -
                     Memorandum of Understanding USMS/FBI/BOP
                     (7/25/94)
      PS 1490.04     Victim and Witness Notification (2/3/98)
      PS 5100.06     Security Designation and Custody
                     Classification Manual (6/7/96)
      PS 5110.12     Notifications of Release to State and Local
                     Law Enforcement Officials (1/21/98)
      PS 5180.04     Central Inmate Monitoring System (8/16/96)
      PS 5250.01     Public Works and Community Service Projects
                     (1/19/93)
      PS 5264.06     Telephone Regulations for Inmates (12/22/95)
      PS 5280.08     Furloughs (2/4/98)
      PS 5322.10     Classification and Program Review of Inmates
                     (9/4/96)
      PS 5325.05     Release Preparation Program, Institution
                     (7/18/96)
      PS 5330.10     Drug Abuse Programs Manual, Inmate (5/25/95)
      PS 5380.05     Financial Responsibility Program, Inmate
                     (12/22/95)

| PS 5550.05 | Escape from Extended Limits of Confinement (3/27/96) |
| PS 5553.05 | Escapes/Deaths Notification (9/17/97) |
| PS 5800.07 | Inmate Systems Management Manual (12/24/91) |
| PS 5800.11 | Central File, Privacy Folder, and Parole Mini File (9/7/97) |
| PS 5873.05 | Release Gratuities, Transportation, and Clothing (9/4/96) |
| PS 5882.03 | Fines and Costs (2/4/98) |
| PS 6000.05 | Health Services Manual (9/15/96) |
| PS 6070.05 | Birth Control, Pregnancy, Child Placement, and Abortion (8/9/96) |
| PS 7300.09 | Community Corrections Manual (1/12/98) |
| PS 7320.01 | Home Confinement (9/6/95) |
| PS 7331.03 | Pretrial Inmates (11/22/94) |
| PS 7430.01 | Community Transitional Drug Treatment Services, Inmate (1/20/95) |

18 U.S.C. § 3621(b)
18 U.S.C. § 3624(c)

4. STANDARDS REFERENCED

   a. American Correctional Association 3rd Edition Standards for Adult Correctional Institutions:  3-4265, 3-4343, 3-4343-1, 3-4387, 3-4388, 3-4388-2, 3-4389, 3-4391, 3-4393, 3-4393-1

   b. American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities:  3-ALDF-3E-04, 3-ALDF-4E-19, 3-ALDF-4E-19-1, 3-ALDF-4F-04, 3-ALDF-4F-05, 3-ALDF-4F-07, 3-ALDF-4G-01, 3-ALDF-4G-06, 3-ALDF-4G-07

   c. American Correctional Association 2nd Edition Standards for Administration of Correctional Agencies:  2-CO-4G-01, 2-CO-4G-02

   d. American Correctional Association Standards for Adult Correctional Boot Camp Programs:  1-ABC-3D-04, 1-ABC-4E-20, 1-ABC-4F-08, 1-ABC-4F-10, 1-ABC-4G-01, 1-ABC-4G-02, 1-ABC-4G-03, 1-ABC-4G-06

5. STATUTORY AUTHORITY.  18 U.S.C. § 3624(c), provides:

   "The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last ten per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust

PS 7310.04
12/16/98
Page 4

to and prepare for the prisoner's reentry into the
community.  The authority provided by this subsection may be
used to place a prisoner in home confinement.  The United
States Probation Office shall, to the extent practicable,
offer assistance to a prisoner during such pre-release
custody."

18 U.S.C. § 3621(b) provides:

"The Bureau of Prisons shall designate the place of the
prisoner's imprisonment.  The Bureau may designate any
available penal or correctional facility . . . the Bureau
determines to be appropriate and suitable."  A CCC meets the
definition of a "penal or correctional facility."

Therefore, the Bureau is not restricted by § 3624(c) in
designating a CCC for an inmate and may place an inmate in a CCC
for more than the "last ten per centum of the term," or more than
six months, if appropriate.

Section 3624(c), however, does restrict the Bureau in placing
inmates on home confinement to the last six months or 10% of the
sentence, whichever is less.

6.  PRETRIAL/HOLDOVER AND/OR DETAINEE INMATES.  This Program
Statement does not apply to pretrial, holdover, or detainee
inmates.

7.  COMMUNITY-BASED PROGRAMS

   a.  Community Corrections Centers (CCC).  CCCs, commonly
referred to as "halfway houses," provide suitable residence,
structured programs, job placement, and counseling, while the
inmates' activities are closely monitored.  All CCCs offer drug
testing and counseling for alcohol and drug-related problems.
During their stay, inmates are required to pay a subsistence
charge to help defray the cost of their confinement; this charge
is 25% of their gross income, not to exceed the average daily
cost of their CCC placements.  Failure to make subsistence
payments may result in disciplinary action.

   These contract facilities, located throughout the United
States, provide two program components:  the Community
Corrections Component and the Prerelease Component:

      (1)  The Community Corrections Component is designed as the
most restrictive option.  Except for employment and other
structured program activities, an inmate in this component is

PS 7310.04
12/16/98
Page 5

restricted to the CCC.  An inmate shall ordinarily be placed in the Community Corrections Component upon arrival at the CCC.

This orientation period normally lasts for two weeks or until the inmate has demonstrated to CCC staff the responsibility necessary to function in the community.  Based on their professional judgment, CCC staff shall determine when an inmate is prepared to advance to the Prerelease Component.

(2)  The Prerelease Component is designed to assist inmates making the transition from an institution setting to the community.  These inmates have more access to the community and family members through weekend and evening passes.

b.  Community Corrections Programs.  In addition to a CCC's traditional services, the Bureau also has the following community-based programs.  Referral procedures may be described in independent Bureau directives issuances.  The Community Corrections Manager (CCM) reviews the inmate's characteristics and the recommendations noted in the referral package to determine if one of the following programs (if available) may be more appropriate than traditional CCC placement.

(1)  Comprehensive Sanctions Center (CSC).  The CSC concept, initiated by the Bureau, with the extensive cooperation and teamwork of U.S. Probation and CCC contractors, was developed to provide courts with a wider range of sentencing options and to facilitate the development and implementation of community program plans tailored to the individual needs of prerelease inmates.

The CSC is designed to meet the needs of higher risk prerelease inmates and consists of six different levels of supervision, ranging from 24-hour confinement to Home Confinement.

It also may have an intensive treatment component consisting of substance abuse education and treatment, life skills training, mental health counseling, education, employment assistance, and mentoring.  The inmate's progress is systematically reviewed by a Program Review Team (PRT), consisting of representatives from the Bureau, U.S. Probation, and the CCC.

(2)  Mothers and Infants Together (MINT).  MINT is an alternative residential program that promotes bonding and parenting skills for low risk female inmates who are pregnant. The inmate is placed in the program two months prior to delivery and remains there for three months after delivery.

(3)  Home Confinement.  Home Confinement is a generic term used to cover all circumstances in which an inmate is required to remain at home during non-working hours of the day.  Electronic monitoring equipment is sometimes used to monitor compliance with the program's conditions.  These programs provide an opportunity for inmates to assume increasing levels of responsibility, while, at the same time, providing sufficient restrictions to promote community safety and convey the sanctioning value of the sentence.

Home Confinement provides an option for inmates who do not need the structure of a residential facility.  Except for inmates who are initially sentenced to and graduate from the Intensive Confinement Center Program, statutory provisions limit the length of Home Confinement to the last 10% of the sentence, or six months, whichever is less.  Inmates are required to pay subsistence of 25% of their gross income to defray the costs of Home Confinement and electronic monitoring.

The Bureau is involved in two Home Confinement programs: Home Confinement operates from the Bureau's own network of CCCs and the U.S. Probation Division program.

(a)  CCC Contractors.  The first form of Home Confinement is CCC contractor-operated programs.  In these programs, CCC staff monitor the inmate.  Currently, only a few of these programs use electronic monitoring equipment.  Supervision is provided by daily telephone contacts and periodic personal contacts in the home and workplace.

(b)  U.S. Probation Office.  The second form of Home Confinement involves placing federal inmates in programs operated by the U.S. Probation Office.  These programs use electronic monitoring equipment with U.S. Probation Officers (USPO) providing supervision.

(4)  Transitional Services Program (TSP).  The community-based transition phase of the Bureau's Residential Drug Treatment Program is designed to complement the accomplishments and continue the institutional program's treatment plan.  It reinforces the inmate's personal responsibility to lead a drug-free lifestyle through personal accountability for choices, confrontation of negative thinking patterns, and instruction in basic social skills.  Inmates who successfully complete the Residential Drug Treatment Program's institutional phase should normally be considered for the maximum 180 day period of CCC placement, if they are otherwise eligible.

(5)  Intensive Confinement Center (ICC).  A lengthy period of Community Corrections Center confinement follows the completion of the ICC program's institutional phase.  The CCC time is divided among the restrictive Community Corrections Component, the Prerelease Component, and Home Confinement. Specific referral procedures are outlined in the ICC Program Statement.

8.  RELEASE PLAN.  Staff shall begin release planning at an inmate's first team meeting, normally the initial classification, and shall continue throughout the inmate's confinement.  The following guidelines apply:

   a.  Planning early in an inmate's period of confinement is necessary to ensure release preparation needs are identified and appropriate release preparation programs are recommended.

   b.  Preliminary decisions regarding eligibility for CC Programs are to be made well in advance of the last year of confinement.

   c.  A final and specific release preparation plan, including a decision as to CCC referral, is normally established at a team meeting no later than 11 to 13 months before an inmate's projected release date.

9.  CCC CRITERIA AND REFERRAL GUIDELINES

   a.  Regular Referrals.  Staff shall make recommendations for CCC placements based on assessments of inmate needs for services, public safety, and the necessity of the Bureau to manage its inmate population responsibly.  CCCs are a program element and are not to be used as a reward for good institutional behavior, although an inmate's institutional adjustment may be a factor in making a referral determination.

   A number of factors must be weighed to determine the length of CCC placement for inmates, including their individual needs and existing community resources.  Ordinarily, inmates with shorter sentences do not require maximum CCC placement due to reduced transition needs.  Additionally, inmates who are required to spend a portion of time in a CCC as a condition of release (i.e. supervised release or court order) do not require an extended Bureau CCC placement.  For example, if the Unit Team determines the inmate needs a six month CCC placement, but the inmate is required to stay in a CCC for 90 days as a condition of release, then the institution shall ordinarily refer the inmate for a 60-90 day CCC placement.

Referrals to CCM offices should include a recommendation regarding the length of stay (range), such as recommending 60 to 90 days or 90 to 120 days, etc. This range of at least 30 days allows the CCM to match population needs with budgetary and CCC bed space resources, a process which requires this flexibility.

However, there will be cases when the institution, for various management reasons, wants the CCM to place the inmate no earlier than a specific date. Then, the CCC referral form should specify a recommended placement date rather than a range and further state that the CCM should not adjust that date. The CCM shall adhere to the recommended date, with any adjustment only being downward if budget and/or bed space constraints are a factor.

The following CCC referral guidelines apply:

(1) An inmate may be referred up to 180 days, with placement beyond 180 days highly unusual, and only possible with extraordinary justification. In such circumstances, the Warden shall contact the Regional Director for approval and the Chief USPO in the inmate's sentencing district to determine whether the sentencing judge objects to such placement.

(2) The ultimate goal is to maximize each eligible inmate's chances for successful release and a law-abiding life.

(3) When an inmate has a history of escape or failure in one or more CC Programs, careful review and consideration should be given regarding the suitability of participation and the length of placement.

(4) Inmates with minor medical conditions or disabilities may also be considered for community placement. Inmates are required to assume financial responsibility for their health care while assigned to community programs. Such inmates must provide sufficient evidence to institution staff of their ability to pay for health care while at a CCC prior to the referral being made. When an inmate is unable or unwilling to bear the cost of necessary health care, the inmate shall be denied placement.

(5) Inmates who have been approved for CCC referral and are otherwise appropriate for camp placement shall be transferred to a camp for intermediate placement. The inmate should have completed the Institution Release Preparation Program at the parent institution. The parent institution shall complete the CCC referral packet and the camp should be closer to the inmate's release residence. This process should be completed to allow the

inmate a minimum of a 60 day placement at the camp prior to the acceptance date at the CCC.

b. <u>MINT Referrals</u>.  Female inmates are eligible to enter the program at the CCC generally during their last two months of pregnancy.  After birth, the mother is allowed three additional months to bond with the child.  The mother shall then be returned to an institution to complete her sentence.  If she is eligible for prerelease services, she may remain at that facility only if she is going to be supervised in that judicial district.

The CEO may approve early or extended placements with a recommendation by the treating obstetrician and Clinical Director's concurrence.  A placement extending beyond 180 days requires the Regional Director's approval.  Direct court commitments shall have a secondary designation noted on the Inmate Load and Security/Designation form (BP-337).  This shall be used to determine the institution responsible for the inmate's medical expenses while she is confined in the MINT Program.

Authority to pay immediate post-natal care of the child born to an inmate while in custody is derived from administrative discretion when the Bureau finds itself responsible for the cost by default (no other resources can be compelled to pay).  It is reasonable that the Bureau provides for the child's medical expenses for the first three days after routine vaginal birth or up to seven days for a Cesarean section.

Prior to the birth, the mother must make arrangements for a custodian to take care of the child.  At this time, the CEO shall ensure the person or agency taking custody of the child is also asked to be responsibile for medical care costs beyond three days after birth.  (<u>Note</u>:  This may be extended by the Regional Director for an additional seven days for extenuating circumstances on a case-by-case basis.)  The person(s) receiving custody of the child should sign a Statement of Responsibility for medical care costs, clearly indicating that the signing party accepts financial responsibility.  Unit Management staff are responsible for obtaining this statement, and forwarding copies to the Health Services Administrator (HSA) for placement in the HSA's outside hospitalization file and to the Controller (see the Sample Statement of Responsibility (Attachment D)).

Health Services staff shall confirm an inmate's pregnancy and evaluate her medical condition.  Health Services staff shall indicate whether CCC placement is medically appropriate and document this on the Medical Evaluation for Transfer of Inmates to CCC Type Facility (BP-351) which shall be forwarded to the Unit Team.

PS 7310.04
12/16/98
Page 10

When the Unit Team has concerns regarding the appropriateness of a CCC placement (such as criminal history, severity of current offense), procedures will be followed according to Section 10.i.(2), Limitations on Eligibility for All CCC Referrals.

The following CCC referral guidelines apply in addition to the guidelines provided for regular referrals:

    (1)  The inmate must be pregnant upon commitment with an expected delivery date prior to release.

    (2)  The inmate or guardian must assume financial responsibility for the child's care, medical and support, while residing at the CCC.  Should the inmate or the guardian be unable or unwilling to bear the child's financial cost, the inmate may be transferred back to her parent institution.

    (3)  An inmate who becomes pregnant while on furlough, or has more than five years remaining to serve on her sentence(s), or plans to place her baby up for adoption shall not be referred for MINT placement.

Referrals to CCMs should state a specific date of placement. This date should be approximately two months prior to the inmate's expected delivery date.

The CCC's Terminal Report should fully describe the inmate's experience in, and reaction to, the MINT Program.  It should also summarize counseling received in the program and include follow-up medical or program recommendations for the institution to facilitate the inmate's transition.

Inmates in need of foster care placement assistance shall be referred to the institution social worker, or if the institution does not have a social worker, staff shall contact a social worker in the community for foster care placement assistance.

10.  LIMITATIONS ON ELIGIBILITY FOR ALL CCC REFERRALS.  Inmates in the following categories shall not ordinarily participate in CCC programs:

    a.  Inmates who are assigned a "Sex Offender" Public Safety Factor.

    b.  Inmates who are assigned a "Deportable Alien" Public Safety Factor.

    c.  Inmates who require inpatient medical, psychological, or psychiatric treatment.

d.  Inmates who refuse to participate in the Inmate Financial Responsibility Program.

e.  Inmates who refuse to participate, withdraw, are expelled, or otherwise fail to meet attendance and examination requirements in a required Drug Abuse Education Course.

f.  Inmates with unresolved pending charges, or detainers, which will likely lead to arrest, conviction, or confinement.

g.  Ordinarily, inmates serving sentences of six months or less.

h.  Inmates who refuse to participate in the Institution Release Preparation Program.

i.  Inmates who pose a significant threat to the community. These are inmates whose current offense or behavioral history suggests a substantial or continuing threat to the community.

Examples are inmates with repeated, serious institution rule violations, a history of repetitive violence, escape, or association with violent or terrorist organizations.

To determine whether an inmate poses a significant threat, a number of factors must be considered.  The key consideration is public safety when assessing the inmate's proclivity for violence or escape against their placement needs.

A waiver of the Public Safety Factor is not required for inmates transferred via unescorted transfer to CCC placements.

Ordinarily, inmates with a single incident of violence should not automatically be excluded from CCC placement.  As noted earlier, clearly dangerous inmates should be excluded from CCC placement.

(1)  When there exists a basis for significant doubt regarding whether the inmate currently poses a threat to the community, the Warden should consider contacting the Chief USPO in the release district (see the Sample letter (Attachment A)) to seek guidance on the referral's appropriateness.  A copy of this letter shall be maintained in the Inmate Central File.

(2)  When an inmate is excluded under this subsection, a memorandum, signed by the Warden, shall be prepared and placed in the Inmate Central File to explain the rationale for exclusion from CC Programs.

PS 7310.04
12/16/98
Page 12

j.  Inmates whose admission and release status is pretrial, holdover, or detainee.

11.  <u>REFUSALS</u>.  When an eligible inmate refuses CCC placement, staff shall investigate the inmate's reasons.  Staff may honor an inmate's refusal of CCC placement.

Suitable reasons to decline placement might include previous CCC failure, potential conflict with other residents, and location or remoteness from release residence.  When the inmate does not present a suitable reason, and the unit team believes that a placement would serve a correctional need, the unit team shall make every effort to encourage participation.

When an inmate refuses placement, a memorandum, signed by the Associate Warden (Programs) and the inmate, shall be placed in the Inmate Central File.  The memorandum should document the inmate's rationale for refusal and all unit team effort to encourage participation.

12.  <u>CCC REFERRAL PROCEDURES</u>.  Normally 11 to 13 months before each inmate's probable release date, the unit team shall decide whether to refer an inmate to a Community Corrections program.

Medical staff shall notify the inmate's Case Manager promptly when a pregnancy is verified.  Upon notification, the unit team shall decide if a MINT referral to a Community Corrections program will be made.

a.  <u>Referral to CCM</u>.  Staff shall use the Institution Referral form (BP-210) (Attachment B) when referring an inmate for transfer to a CCC.  Information included in the Additional Information (11) and Specific Release Preparation Needs (12) sections must be as specific as possible regarding the inmate's needs.

Attachment B contains instructions for completing the Institution Referral form and related materials.  Signed copies of the "Community Based Program Agreement" must be included with all CCC referrals.  The Warden is the final decision-making authority for all CCC referrals the unit team recommends.

If the Warden approves the CCC referral, the unit team shall forward two copies of the Institutional Referral form and appropriate attachments to the CCM.  Staff shall enter the DST SENTRY assignment of "W CCC ACT."  Copies of appropriate documents are prepared so that one may be forwarded to the CCC while the CCM retains the other for reference.

PS 7310.04
12/16/98
Page 13

A separate packet with appropriate copies shall be forwarded to
the Transitional Services Manager (TSM) in the receiving region
where the inmate is being released for graduates of Residential
Drug Abuse Programs.  Staff are referred to the Drug Abuse
Programs Manual for responsibilities and/or documentation
requirements.  If the CCC referral packet is mailed prior to
completion of the Treatment Summary and Referral form (BP-549),
the Drug Abuse Treatment Coordinator shall forward the completed
BP-549 form to the Transitional Services Manager in the region of
the inmate's release and provide a copy to the unit team.

The referral packet shall be forwarded to the CCM at least 60
days prior to the maximum recommended range or date.  However,
additional time may be required for processing inmates with
special community-based program needs (i.e. mental health, drug
transition, disabilities, and inmates with higher security
needs).

For MINT referrals, the referral packet shall ordinarily be
forwarded to the CCM at least 60 days prior to the recommended
date.  If the inmate is committed to Bureau custody or arrives at
the designated facility at any stage during the second trimester
of pregnancy, the referral shall be forwarded to the CCM as
quickly as possible.

If an inmate is scheduled for release via parole, and CCC
placement is for 45 days or less, a copy of correspondence
directed to the U.S. Parole Commission (USPC) outlining the
release plan and requesting parole certificates, as well as
copies of the USPO's letter recommending release plan approval,
must be included in the referral package.

b.  Mandatory CCC Residence.  When an inmate must reside in a
CCC as a condition of parole, mandatory release, or supervised
release supervision after release from confinement, the
institution shall refer the case to the appropriate CCM, who
shall refer the case for placement under these procedures:

Institutions shall notify the USPC of cases that cannot be
placed (see specific information in Attachment B).  Inmates in
this category should not be referred for transitional purposes
and have this time "stacked" on to the Court or USPC's ordered
period of CCC placement.

Inmates releasing from an institution via 3621E CMPL or 4046C
CMPL, or who have mandatory CCC residence as a condition of
parole, mandatory release, or supervised release supervision,
should be referred for release preparation transfer to a CCC, and
the CCM should work with U.S. Probation to waive the CCC

requirement during the period of supervision.  The CCM shall attempt to affect the 180 day release preparation placement for inmates releasing via 3621E CMPL or 4046C CMPL.  The CCM shall keep the appropriate U.S. Probation Office apprised of the inmate's progress toward reaching the goals of Community Corrections programming.  Should the USPO still require CCC placement as a condition of supervision, the CCM will ordinarily honor the request.

   c.  Referral to CCC.  CCMs shall immediately forward referrals to appropriate CCCs.  CCC staff shall notify CCMs in writing of acceptance or rejection.  When referrals are accepted, CCCs will send acceptance letters, subsistence collection agreements, and CCC rules and regulations to inmates in care of their Unit Managers.  Institution staff shall ensure acknowledgment forms are returned to CCCs.  CCMs shall monitor referrals for timely response from contractors.

   d.  CCC Rejection.  CCC staff must provide specific reasons, in writing, to CCMs when they reject referrals.  In such cases, CCMs shall determine if further discussion with the CCC staff is appropriate or, if not, referral to an alternate resource is possible.  When all placement options have been exhausted, the CCM shall inform the referring institution Warden, with copies to the Unit Manager, that the inmate cannot be transferred to a CCC and the reason for rejection.

   e.  Transfer Date.  When CCMs are notified of an inmate's acceptance by a CCC, a transfer date to the CCC is to be established, and the CCM shall enter the SENTRY destination assignment transaction.  The effective date shall be the approved future transfer date.

   Destination assignments, "DST," have been established in SENTRY for contract CCCs and work release programs.  These assignments use the CCM facility code followed by the contract location code.  CCMs may add their contract location destination assignments for inmates in any Bureau facility.  When an inmate arrives at the CCC and is admitted to the location (in SENTRY), the destination assignment is automatically removed.

   These assignments shall appear on the CCM and institution SENTRY daily log.  Institution staff may display rosters of inmates approved for CCC transfer, and CCMs may display lists of pending arrivals by contract location.

   The location description (name of the CCC) shall appear on the inmate's profile.  If, for any reason, an inmate cannot be

transferred to a CCC on the scheduled date, institution staff shall notify the CCM immediately.

13. <u>PREPARATION FOR TRANSFER</u>

a. <u>Trust Fund Account</u>. No later than three weeks prior to the approved transfer date, unit staff are to determine the amount in the inmate's trust fund account that may be given to the inmate at the time of transfer. A check or draft for the balance (with the inmate as payee) shall be sent to the CCC immediately.

In accordance with the Program Statement on Telephone Regulations for Inmates, inmates transferring to CCCs shall be qualified as "exception" cases during the three-week period prior to the approved transfer date for purposes of placing collect telephone calls.

Institution staff should use discretion in giving inmates large amounts of cash, and if there is reason to question an inmate's ability to handle money responsibly, the amount may be reduced.

For inmates who have no funds or resources, unit staff shall determine the extent to which a gratuity is indicated and shall initiate paperwork, if appropriate (see the Program Statement on Release Gratuities, Transportation, and Clothing).

If the institution is holding savings bonds for an inmate, or if an inmate has a savings account at a local bank, the unit staff is to ensure these financial resources are available at the release destination when the inmate arrives.

b. <u>Documentation to CCC</u>. No later than two weeks prior to an inmate's approved transfer date, institution staff shall forward the following documents to the CCC:

(1) Authorized Unescorted Commitments and Transfers (BP-385), with current photograph;

(2) Original of the Transfer Order;

(3) Copy of Furlough Application and Approval Record, with specific travel method and itinerary;

(4) Receipt for CCC rules and regulations, if applicable (this may include the CCC's subsistence agreement form); and,

c. <u>Clothing</u>. No later than one week prior to an inmate's approved transfer, staff shall make arrangements for release clothing. Suitable release clothing shall be provided as

described in the Program Statement on Release Gratuities, Transportation, and Clothing. For non-MINT referrals, at a minimum, release clothing is to include adequate clothing to complete a job search and perform work. Additionally, an outer garment, seasonably suitable for weather conditions at the inmate's release destination, shall be provided.

d. Medication. No later than one week prior to an inmate's approved transfer, Health Services staff shall review the inmate's medical record to determine if the inmate is on continuous medication. When an inmate is transferred to a CCC, a 30-day supply of chronic medication shall be provided pursuant to a new prescription. If an inmate is prescribed a controlled substance, assistance from the CCM may be required to determine if the CCC can accommodate the inmate's special medication needs. Staff should refer to the Health Services Manual for further clarification. CCC staff are to safeguard, store, and dispense controlled substances in accordance with the terms of their Bureau contracts.

e. Identification. It is essential that each inmate have some acceptable form of identification while at a CCC. Therefore, during Institution Release Preparation Programs, unit staff shall assist inmates to acquire social security cards (mandatory) and, if possible, drivers license, and copies of·their birth certificates. Additional photo identification may be required if the inmate is using air transportation. These items may be given to an inmate on the transfer date, or mailed to CCCs prior to transfer with the materials described in subsection b. above.

f. Community Custody Status. An inmate must be assigned "COMMUNITY" custody status prior to transfer to a CCC. Unit staff shall state the inmate's current custody status if other than "COMMUNITY" on the Transfer Order in the Custody Classification section. Next to the current custody, unit staff shall type "Community custody effective on (whatever date the Warden deems appropriate)."

g. Parole Commission Review of Disciplinary Action. An inmate who has had a discipline hearing resulting in a Discipline Hearing Officer finding, after USPC action to establish a presumptive or effective parole date, may not be transferred to a CCC until the Commission has considered the disciplinary report and final action has been taken.

h. Sentence Calculation. The Inmate Systems Manager (ISM) of the sending institution shall ensure that an inmate's old law sentence computation is "complete" with all appropriate good time entered before the inmate departs the institution.

i. _Final Review of 3621(e) Eligibility_. The decision to grant an inmate early release is a significant one for the Bureau; therefore, it is essential that unit staff carefully review relevant statutory and regulatory criteria before an inmate's final release under 18 U.S.C. § 3261(e). Specifically, the Unit Manager or designee must ensure completion of "Final Review of 3621(e) Eligibility" (Attachment K from the Drug Abuse Programs Manual), before unescorted transfer to a CCC or release to a detainer (Drug Abuse Programs Manual, Inmate). Attachment K must be completed and routed to the Warden. Ordinarily, Attachment K should be routed to the Warden along with other CCC release paperwork (i.e., transfer order, furlough application, etc.); however, a copy of Attachment K is not forwarded to the CCC.

The Drug Abuse Program (DAP) Coordinator and CMC must review and sign Attachment K prior to the Warden's review. The DAP Coordinator's review is to ensure that items 5, 7, and 8 are accurate. Once Attachment K is signed and dated, the Unit Manager must ensure that a copy is filed in the disclosable portion of Section 5 (release processing) in the Inmate Central File. The original Attachment K shall be forwarded to the ISM for filing in the Judgment and Commitment (J&C) file.

No inmate shall be released from an institution to a CCC (or detainer) until the ISM receives the Attachment K with appropriate signatures.

j. _Education_. To assist an inmate in securing employment, the inmate should have a resume', a copy of his or her education transcript, GED certificate, and any other education/vocational training certificates completed during his or her confinement.

k. _Exemption from Time Requirements_. When transfer dates have not been established in time for staff to implement the above procedures within the time requirements, they shall be accomplished as soon thereafter as possible.

14. _TRANSFER AND ARRIVAL NOTIFICATION_

a. _Transportation Costs_. Staff are referred to the Program Statement on Furloughs for procedures regarding transportation costs for inmates scheduled for transfer to a CCC.

b. _Notification of Travel Schedule_. On the date of transfer, the sending institution's ISM shall notify the CCM via BOPNet GroupWise of the inmate's departure and travel schedule. A copy of this notification shall be placed in the inmate's J&C file. If GroupWise is inoperable, the notification shall be made by telephone and documented in the J&C file.

c.  <u>Arrival Notification</u>.  CCC staff shall notify CCMs immediately when an inmate arrives as a transfer from an institution.  Immediately means:

(1)  Upon arrival, if during regular CCM working hours; or

(2)  At the first opportunity during regular CCM working hours if arrival is during evenings, weekends, or holidays.

d.  <u>Electronic Notification</u>.  By close of the business day following an inmate's scheduled arrival, the CCM shall "admit" the inmate in SENTRY, if the CCC has confirmed the inmate's arrival.  When GroupWise is inoperable, notification of arrival shall be made by telephone to the sending institution's ISM, and the inmate "admitted" in SENTRY at the earliest opportunity.

e.  <u>Escape</u>.  If an inmate has not arrived at the CCC within a reasonable period after the scheduled arrival time (no later than 24 hours), the CCM shall report the inmate as an escapee.  Then, the ISM at the sending institution must be notified immediately by telephone or GroupWise.

The ISM at the sending institution is responsible for updating SENTRY to indicate the change in release status from "furlough transfer" to "escape" as of the date the inmate fails to report. The ISM at the sending institution also shall make the inmate's sentence computation inoperative as of the date following the escape.  Staff at the sending institution shall write an incident report and conduct a UDC/DHO hearing in absentia.  The sending institution shall make all notifications required by the Program Statement on Escapes/Deaths Notification.  The ISM at the sending institution shall also notify the FBI of the inmate escape.  The ISM at the sending institution must also fax a copy of the Notice of Escaped Federal Prisoner (BP-393) to the FBI, U.S. Marshals Service, local law enforcement officials, and law enforcement at the inmate's home of record.  The Inmate Central File is to be retained at the sending institution.

The CCM shall notify the U.S. Marshals Service in the CCC district.  The CCM shall also notify the Regional Director, the Central Office, and the sending institution via GroupWise of the escape.

f.  <u>Arrival Confirmation</u>.  The ISM at the sending institution shall use SENTRY to confirm an inmate's arrival at a CCC.  When an inmate's arrival is confirmed, the ISM shall forward the following documents to the CCM by certified mail:

PS 7310.04
12/16/98
Page 19

(1)  Applicable release forms and certificates that have been completed insofar as is possible by unit staff and reviewed by ISM;

(2) Victim/Witness Notification form (BP-323), if applicable;

(3) .Completed and current committed fine forms and all related documentation such as the PSI, if applicable;

(4) Copies of conditions of supervised release, if applicable; and

(5) Appropriate forms and other documentation concerning final good conduct time awards for an inmate sentenced under the CCCA.

15.  <u>INMATE CENTRAL FILE</u>.  The Inmate Central File shall be retained at the institution consistent with provisions established in the Program Statement on Inmate Central File, Privacy Folder, and Parole Mini-files.


/s/
Kathleen Hawk Sawyer
Director

PS 7310.04
12/16/98
Attachment A

Sample letter for Wardens to send to Chief USPOs

John Jones, Chief USPO
Judicial District
Street Address
City, State  Zip Code

Re:  Doe, John
Reg. No.:  12345-678

Dear Mr. Jones:

 The above-noted inmate will complete his/her sentence on
_____ and is being considered for referral to a
Community Corrections Center (CCC) on or about _____
for prerelease services.  Because of certain factors in this
offender's case, we are closely reviewing his/her appropriateness
for CCC placement.  Therefore, I am soliciting your view in this
matter recognizing that your office will soon be responsible for
supervising this offender in the community.

 Please indicate below whether or not you favor release
through a CCC for this offender.  Feel free to attach additional
comments.  If you favor release through a CCC, I ask that you
consider providing some assistance in initiating the supervision
process while the offender resides in the CCC.  Please return
this letter as soon as possible so that release planning can be
finalized.

 Thank you for your assistance in this matter of mutual
concern.

<div align="center">Sincerely,</div>

<div align="center">Warden</div>

_____ Yes, I favor referral to a CCC for
       prerelease services.

_____ No, I do not favor referral to a CCC.

Comments:_____

_____

_____
Chief USPO
District

_____
Date

Please refer to the latest issuance of BOPDOCS for a copy of BP-S210.073, INSTITUTIONAL REFERRAL FOR CCC PLACEMENT.

INSTRUCTIONS FOR COMPLETION OF INSTITUTIONAL REFERRAL FOR CCC PLACEMENT

All federal institutions shall use the standard form "Institutional Referral for CCC Placement", BP-210, when referring inmates for community corrections placement in any type of community program.

The following instructions will be followed when completing the form:

<u>GENERAL INFORMATION</u>:

♦ Use the current EMS Community Corrections Directory (BOP COMM CORR DIR) or BOPDOCS Community Corrections Directory to determine the appropriate CCM.

♦ All referrals shall be signed by the Warden.

♦ Provide the inmate's full committed name and register number. The inmate's unit should also be included.

♦ Identification of Unit Manager and GroupWise mailbox codes will expedite notification.

♦ Institution name and mailing address allows CCC staff to send materials directly to the unit manager.

<u>SPECIFIC INFORMATION</u>:

1. Indicate the inmate's city of residence upon release. A complete address should be included in current progress report. Indicate the federal district of supervision.

2. The ISM shall insure the anticipated release date provided on the referral includes all eligible good time earnings. The date should be an accurate <u>estimate</u> of the date the inmate is to be released from custody. If release is by parole, only the parole date needs to be indicated. At the time of this review, the ISM will insure there are no detainers that would prevent CCC transfer.

3. Staff specifying a recommended placement date shall further indicate that the CCM should not adjust that date. (Include this information in Item 12.) CCMs shall adhere to the recommended date, with any adjustment only being downward due to budget or bedspace constraints as a factor.

PS 7310.04
12/16/98
Attachment B, Page 3

For MINT referrals, staff should provide a specific date of placement, which is normally two months prior to the requested delivery date.  Planned periods of longer than six months require the Regional Director's approval and the Chief U.S. Probation

Officer in the inmate's sentencing district to determine whether the judge concurs with the placement.  (Include this information in Item 12.)

4.  Indicate the date the report was submitted and attach a copy of any transmittal memo to the USPC.

5.  An inmate who has been scheduled for a statutory interim hearing may not be transferred to a CCC until after the hearing or unless the inmate waives the hearing.  If neither is the case, the CCM will hold the referral in abeyance until the matter is resolved.  This information should be included in item 11.

6.  Offenders sentenced under the Sentencing Reform Act or the Anti-Drug Abuse Act may have a term of supervised release following confinement.  Offenders convicted of drug offenses may have a Special Parole Term.

7.  Indicate if the inmate has "aftercare" requirements (must be imposed as a supervision condition by the U.S. Parole Commission, or the sentencing court).  This helps the CCM select the most appropriate facility.

8.  If the inmate is a Central Inmate Monitoring case, the Warden has clearance authority on all CIM cases with the exception of WITSEC cases.  The Inmate Monitoring Section, Central Office will provide CIM clearance for WITSEC cases.

9.  If the area of referral is not the sentencing district, staff will forward release planning materials to the probation office in the proposed district of supervision.  Institution staff should refer to the Operations Memorandum on Release Planning, Inmate - Memorandum of Understanding (MOU) Between the BOP and the Administrative Office of the U.S. Courts for further instructions.  At the time of the unit team's recommendation for CCC placement, the case manager should submit release plans to the USPO if other than the sentencing district.  A relocation acceptance letter should be included in the CCC referral packet. Additionally, for inmates releasing in their sentencing district, a copy of the proposed supervised release plan with the final progress report shall be forwarded to the probation office in the sentencing district for verification of residence and employment.

PS 7310.04
12/16/98
Attachment B, Page 4

10.  The Program Statement on Fines and Costs describes institution responsibilities for CCC transfers for inmates who have fines.  If the inmate has a committed fine, include this information in item 11.

11.  It is extremely important to include any information that might have a bearing on the facility's decision to accept the inmate for placement.  Information on outstanding detainers or pending charges must be included.  Indicate if there is a substance abuse history.  Also, indicate if the inmate has successfully completed the institutional phase of the comprehensive drug treatment program.  If more space is needed, attach an additional page.

12.  Information on special needs of the individual and/or unusual circumstances is very important for staff in deciding on acceptance and setting up an individual program plan once the inmate is accepted.  If staff wish to recommend a specific facility or program, they may include that information here.  The CCM, in managing the CCC population, will consider the referenced special needs when establishing an acceptance date.  Therefore, detailed and specific comments in this section are very helpful. If more space is needed, attach an additional page.  Prenatal care needs should be addressed also.

Inmates who are <u>released</u> from institutions with a condition of parole, mandatory release, or supervised release that requires they reside in a CCC must be referred for CCC placement prior to their release.  CCMs will notify institutions of acceptance or rejection.

13.  For MINT referrals, indicate the expected date of delivery. and the projected date of the inmate's return to the parent institution.

●<u>INFORMATION TO BE INCLUDED IN THE CCC REFERRAL PACKET TO CCM</u>:

A checklist is provided on the referral form to insure that all necessary material is included.  CCMs who receive referrals without the required information or documents are instructed to hold the referral in abeyance until they are able to obtain the information from the institution.

<u>Referral Form</u>
All items shall be completed.  Do not indicate "See progress report".

PS 7310.04
12/16/98
Attachment B, Page 5

Current Progress Report
A current progress report (less than 180 days old at time of
referral), including any significant new information that is
available since the report was written, must be included with the
referral.  Especially important is specific information regarding
proposed residence and employment (including telephone numbers),
availability of other community resources, and any other
information regarding release plans.

Presentence Investigation/Violation Report
Two copies of all relevant presentence investigation/violation
report(s).

Community Based Program Agreement
This form allows facility staff to discuss the referral with
family, potential employers, and other community resources and
notifies the inmate of any special conditions of CCC residence
such as financial responsibility and urinalysis.  This form also
acknowledges the inmate's agreement to comply with the rules and
regulations of the Home Confinement program and stipulates that
participation in home confinement may be an alternative to
placement in a Community Corrections Center.  Additionally, for
MINT referrals, it notifies the inmate or the guardian/foster
care provider of their responsibility for medical care and
subsistence of the child while in a community based program.

BP-339 CIM Case Information Summary
This document is required for all CIM assignments except for
"pure" separation cases.

USPO Acceptance Letter
If an inmate is releasing to a district other than the sentencing
district, a relocation acceptance letter from the appropriate
USPO must be included in the referral packet.

Copy of Latest Parole Commission Notice of Action
Provide the most current copy which includes specific action,
such as the presumptive parole date, effective parole date,
continue to expiration, etc.

BP-351 Medical Evaluation for Transfer of Inmates to CCC Type
Facility
Must be completed prior to the referral in order to advise the
facility of potential problems or special medical needs.

Judgment and Commitment Order
Serves as documentation of authority to maintain custody and
identifies special commitment conditions.  If necessary, this
document can be provided to the U.S. Marshals Service for
purposes of apprehension or maintaining custody.

Statement of Responsibility (MINT Referrals)
For MINT referrals, this serves to notify the CCM, CCC, and
institution staff of who will assume custody and total financial
responsibility for the child.

●INFORMATION TO BE FORWARDED TO THE TRANSITIONAL SERVICES
MANAGER:

Information should be forwarded to the TSM in the region where
the inmate is releasing.  Staff are to refer to the Drug Abuse

Programs Manual, Inmate for additional information for
responsibilities/documentation.

Treatment Summary and Referral Form - Drug Abuse Treatment
Programs

This form provides assessment findings, treatment progress and
other pertinent information for inmates who are graduates of
Residential Drug Abuse Programs.

Agreement to Participate in Community Transition Programming
By signing this form, the inmate acknowledges that he/she
understands and agrees to comply with program rules and
regulations of the Bureau's community-based drug programs.

Progress Report
Refer to summary provided in "Current Progress Report" for
INFORMATION TO BE INCLUDED IN THE CCC REFERRAL PACKET TO CCM.

Referral Form
Refer to summary provided in "Referral Form" for INFORMATION TO
BE INCLUDED IN THE CCC REFERRAL PACKET TO CCM.

OTHER INFORMATION

Any information or documents believed to be necessary to assist
in the pre-release planning process.  A current psychological
report should be included if it is anticipated the inmate will
have mental health needs.

Correspondence from/to family, friends, prospective employers, probation officers, etc., that may provide specific information about release plans and resources. A copy of the referral form is sent to the CUSPO in the sentencing district and the district of supervision. Other pertinent documents will have already been sent by the institution to these offices.

Procedures

For inmates being referred to contract facilities, the CCM will forward the referral to the appropriate facility, with instructions for the facility director to reply to the CCM with a copy to the referring institution. In addition to the transfer date, the facilities letter of acceptance will usually include documents for the inmate to sign and return prior to transfer. Such documents should be returned to the CCC by institution staff with the BP-385(51), transfer order and furlough papers.

The CCM maintains a copy of the referral for reference, should any questions arise from the facility, USPO, inmate's family or the institution.

Using institution records, unit staff will complete as much information as they can on release paperwork. Only the "unknowns" which must be determined while the inmate is in the CCC will be left blank. Inmates do not sign release papers (acknowledging they understand supervision conditions) and institution staff do not sign "certifying release" prior to an inmate's transfer. These certifications are done by CCC staff at the time of an inmate's release.

The institution is responsible for typing all information on release certificates. The line "now confined in the" shall specify the name of the CCC from which the inmate is to be released.

The inmate should sign the space at the bottom of the release certificate indicating an understanding of the conditions of release before departure from the CCC. The CCC Director is to sign the bottom portion of the form as the Chief Executive Officer verifying the inmate's release.



# Statutory Authority to Contract With the
# Private Sector for Secure Facilities

*The Federal Bureau of Prisons has statutory authority to contract with the private sector for secure facilities.*

March 25, 1992

## MEMORANDUM OPINION FOR THE DIRECTOR
## FEDERAL BUREAU OF PRISONS

This memorandum responds to your request for our opinion whether the Federal Bureau of Prisons ("BOP") has statutory authority to contract with the private sector for secure facilities.[1] The General Accounting Office ("GAO") has concluded that BOP lacks such authority;[2] BOP has taken the opposite view.[3] For the reasons explained below, we conclude that BOP has statutory authority to contract with the private sector for secure facilities.

### I.

BOP was established in the Department of Justice in 1930 to provide a central federal organization responsible for the care and treatment of federal prisoners. H.R. Rep. No. 106, 71st Cong., 2d Sess. 1 (1930). BOP has the authority and responsibility under 18 U.S.C. § 3621(b) to "designate the place of . . . imprisonment" for prisoners who have been sentenced to a term of imprisonment under relevant federal statutes. BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau [of Prisons], whether maintained by the Federal Government or otherwise." 18 U.S.C. § 3621(b).[4]

---

[1] See Memorandum for J. Michael Luttig, Assistant Attorney General, Office of Legal Counsel, from J. Michael Quinlan, Director, Federal Bureau of Prisons (Apr. 26, 1991) ("Opinion Request").

[2] GAO, Private Prisons, Cost Savings and BOP's Statutory Authority Need to be Resolved: Report to the Chairman, Subcomm. on Regulation, Business Opportunities and Energy, House Comm. on Small Business (Feb. 1991) ("GAO Report").

[3] See Opinion Request at 1; Memorandum for J. Michael Quinlan, Director, from Clair A. Cripe, General Counsel, Federal Bureau of Prisons at 4 (Oct. 14, 1988) ("1988 Memorandum"); Memorandum for Norman A. Carlson, Director, from Clair A. Cripe, General Counsel, Federal Bureau of Prisons (June 10, 1983), reprinted in Privatization of Corrections: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary, 99th Cong., 1st & 2d Sess. 150 (1985-86) ("Privatization Hearing").

[4] Section 3621(b) is applicable to those convicted of offenses committed on or after November 1, 1987. See 18 U.S.C. § 3621 note. It is based on former 18 U.S.C. § 4082(b), reprinted in 18 U.S.C. § 4082 note, which governs as to offenses committed before November 1, 1987. Former section 4082(b) provided in part that "[t]he Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise." References to section 4082 in this

BOP has consistently taken the position that the language of section 3621(b) -- especially as it refers to facilities "whether maintained by the Federal Government or otherwise" -- allows it to place federal prisoners in facilities operated by the private sector as well as those run by federal, state, or local authorities. See Opinion Request at 1; 1988 Memorandum at 4; Privatization Hearing at 150. It has relied for this conclusion on the plain language of the statute and on general principles of federal procurement law under which executive agencies may enter into contracts with the private sector. See Opinion Request at 1; 1988 Memorandum at 2-3; Privatization Hearing at 149-50; Bureau of Prisons and the U.S. Parole Commission:  Oversight Hearing Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary, 99th Cong., 1st Sess. 16-17 (1985) ("1985 Hearing"); see also Privatization Toward More Effective Government:  Report of the President's Commission on Privatization 147 (Mar. 1988) ("President's Commission").[5]

GAO, however, has concluded that, at least as to secure facilities, the statute's reference to facilities "maintained by the Federal Government or otherwise" includes only federal, state, and local facilities, but not facilities operated by the private sector. See GAO Report at 45-50. GAO argues that there is no evidence that Congress contemplated private incarceration of federal prisoners except in limited circumstances involving residential community treatment centers such as halfway houses. Id. at 48-49.[6] GAO contends that the

---

memorandum should be understood to refer to former section 4082. Our analysis in this memorandum applies to the authority to designate the place of incarceration under both section 3621(b) and former section 4082(b). References in this memorandum to the history of section 3621(b) should be understood to include its predecessor statutes.

[5]One writer has claimed that BOP's former director, Norman A. Carlson, testified to the contrary in a 1985 Hearing. See Ira P. Robbins, The Legal Dimensions of Private Incarceration 399 n.940 (1988) ("Robbins"). However, Robbins quotes only a portion of Carlson's remarks.  In context, it is plain that Carlson stated that he was unsure, without the benefit of advice of counsel, whether BOP could privatize "one of the existing 45 institutions." 1985 Hearing at 17 (emphasis added).  He stated unequivocally his view that BOP has "statutory authority in [its] enabling legislation in title 18 to contract with State, local or private agencies for the care and custody of offenders.  I think the enabling legislation gives us that authority." Id. at 16. Carlson further clarified his position in a 1986 hearing:

> Although I raised some question [regarding the legal authority to contract for an entire facility] when I testified before this subcommittee in March of 1985, our General Counsel advises me that we currently have the necessary authority to contract for the management of an entire facility under 18 U.S.C. § 4082. This law allows the Attorney General to designate as a place of confinement "any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise."

Privatization Hearing at 141.

[6]A residential community treatment center is a pre-release facility to which a prisoner may be transferred in order to be assisted in becoming re-established in the community. S. Rep. No. 613, 89th Cong., 1st Sess. 7 (1965) ("S. Rep. No. 613"). Such facilities are contrasted with secure facilities used to house prisoners who "remain a distinct threat to the community." Id. at 7-8.

authority in section 3621(b) to place prisoners in any facility "whether maintained by the Federal Government or otherwise" is circumscribed by 18 U.S.C. § 4002 (authorizing the Attorney General to contract for the incarceration of federal prisoners with states and localities) and 18 U.S.C. § 4003 (permitting the Attorney General to cause new federal facilities to be erected), which in GAO's view outline the only two options available to BOP for obtaining incarceration facilities.  GAO Report at 46-48.[7]

<div align="center">II.</div>

We begin our analysis with the language of the statute.  As the Supreme Court has recently said, in construing a statute the one "cardinal canon before all others," is that we must "presume that a legislature says in a statute what it means and means in a statute what it says there."  Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992).  "When the words of a statute are unambiguous, then, this first canon is also the last: '[the] inquiry is complete.'"  Id. at 254 (quoting Rubin v. United States, 449 U.S. 424, 430 (1981)).

The plain language of section 3621(b) gives BOP open-ended authority to place federal prisoners in "any available penal or correctional facility" that meets minimum standards of health and habitability without regard to what entity operates the prison.  As if to emphasize the breadth of BOP's authority to use "any available facility," Congress expressly noted that such facilities could be those "maintained by the Federal Government or otherwise."  The

---

[7]Section 4002 of title 18 provides in part:

> For the purpose of providing suitable quarters for the safekeeping, care, and subsistence of all persons held under authority of any enactment of Congress, the Attorney General may contract, for a period not exceeding three years, with the proper authorities of any State, Territory, or political subdivision thereof, for the imprisonment, subsistence, care, and proper employment of such persons.

Section 4003 provides that if the authorities of a state, territory, or political subdivision thereof are unable or unwilling to enter into such contracts or "if there are no suitable or sufficient facilities available at reasonable cost, the Attorney General may select a site . . . and cause [an appropriate facility] to be erected."

words "or otherwise" are not qualified or defined.  They are most obviously read to include (as

the statute has already described) any penal or correctional facility -- without regard to whether

it is maintained by a state, local, or private entity -- as long as it meets "minimum standards of

health and habitability established by the Bureau."  In short, there is nothing in the language of

section 3621(b) that limits BOP's placement authority to those facilities operated by the federal

government, states, or localities.  Based on the well-recognized canon of statutory construction

referred to above, we believe that the plain language of section 3621(b) is dispositive as to

BOP's authority to place prisoners in facilities operated by the private sector.

      Although GAO concedes that the plain language of section 3621(b) does not limit
BOP's choice of prison operators, GAO Report at 48, GAO asserts that section 3621(b)'s
legislative history establishes that Congress did not authorize placing federal prisoners in
private secure facilities such as are at issue here.  It contends that

> [n]othing in the legislative history of this provision suggests that Congress ever
> contemplated having private parties operate adult secure facilities.  Rather, it
> appears that Congress' intention in enacting the provision concerning places of
> confinement was simply to clarify that the Attorney General would have the
> power to choose the places prisoners would be confined, which at that time were
> limited to federal or state and local institutions.

GAO Report at 48.

      In light of the plain language of section 3621(b), we think GAO's conclusion that BOP
lacks the authority to designate private secure facilities -- based on the <u>absence</u> of comment on
that issue in the legislative record -- is an incorrect reading of the statute.[8]  Moreover, even if
we were to rely on the legislative history of section 3621(b) to determine BOP's authority to

---

[8]We note that while GAO reports are often persuasive in resolving legal issues, they, like opinions of the
Comptroller General, are not binding on the executive branch.  <u>See</u> Memorandum for Donald B. Ayer, Deputy
Attorney General, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel
at 8 (Dec. 18, 1989) ("This Office has never regarded the legal opinions of the Comptroller General as binding
upon the Executive."); <u>Reimbursement for Detail of Judge Advocate General Corps Personnel to a United States
Attorney's Office</u>, 13 Op. O.L.C. 188, 189 n.2 (1989) ("The Comptroller General is an officer of the legislative
branch, <u>see</u> <u>Bowsher v. Synar</u>, 478 U.S. 714, 727-32 (1986), and historically, the executive branch has not
considered itself bound by the Comptroller General's legal opinions if they conflict with the legal opinions of the
Attorney General and the Office of Legal Counsel.").

place prisoners in privately operated facilities, we find nothing in the legislative history of section 3621(b) to indicate that Congress intended to preclude the use of such facilities to incarcerate federal prisoners. The language now contained in section 3621(b) originated in the Act of May 14, 1930, Pub. L. No. 71-218, 46 Stat. 325 ("1930 Act"), and was adopted to resolve an ambiguity as to who had the power to designate the place of confinement of federal prisoners. S. Rep. No. 533, 71st Cong., 2d Sess. 2 (1930) ("S. Rep. No. 533") (statement of the Attorney General). It authorized the Attorney General to "designate any available, suitable, and appropriate institutions, whether maintained by the Federal Government or otherwise."[9] The language enacted in 1930 has remained substantially unchanged through its present codification in 18 U.S.C. § 3621(b).[10] During the various reenactments of the provision, there was never any indication that the power to designate the place of confinement was limited to designation of federal, state, or local facilities. See, e.g., S. Rep. No. 225, 98th Cong., 1st Sess. 141 (1983) ("The designated penal or correctional facility need not be . . . maintained by the Federal Government.").

On the contrary, there is evidence in the legislative history of section 3621(b) that at least after a 1965 amendment Congress specifically anticipated that BOP would designate privately operated facilities as places of incarceration. In 1965 Congress amended the designation provision to allow designation of a "facility" as well as an "institution." Act of Sept. 10, 1965, Pub. L. No. 89-176, 79 Stat. 674 (former § 4082(b), reprinted in 18 U.S.C. § 4082 note). The word "facility" was defined to "include a residential community treatment center." Id. at 675 (former § 4082(g), reprinted in 18 U.S.C. § 4082 note).[11] The legislative history of former section 4082(g) indicates that by enacting that definition Congress intended that "facility" would include community treatment centers such as those already being used to place juvenile offenders. See S. Rep. No. 613 at 3-4. As GAO concedes, GAO Report at 23, at least one of those juvenile facilities was being operated by contract with a nongovernmental entity:

> The residential community treatment centers, to which the bill authorizes the
> Attorney General to commit and transfer prisoners, are similar to the so-called

---

[9]This language, contained in section 7 of the 1930 Act, was originally codified at 18 U.S.C. § 753f, see 18 U.S.C. § 4082 note, and was later reenacted in modified form and codified at former 18 U.S.C. § 4082(b). See supra note 4.

[10]Former section 4082(b) authorized the Attorney General to designate the place of incarceration for federal prisoners. Section 3621(b) gives that authority to BOP, a component of the Justice Department. The change was not intended to affect the authority with regard to place of confinement, but rather only to simplify the administration of the prison system. S. Rep. No. 225, 98th Cong., 1st Sess. 141 (1983).

[11]The definition of "facility" in former section 4082(g) did not limit application of the term to residential community treatment centers. See 2A Norman J. Singer, Sutherland Statutory Construction § 47.07, at 152 (3d ed. 1992 rev.) ("Sutherland") ("[T]he word `includes' . . . conveys the conclusion that there are other items includable, though not specifically enumerated."). In any event, Congress deleted the definition of "facility" when it substantially reenacted section 4082(b) in section 3621(b). Thus, particularly as it appears in section 3621(b), "facility" is not limited to residential community treatment centers. We reject the suggestion to the contrary in Robbins at 412-13.

halfway houses now operated by the Department of Justice for juvenile and youthful offenders. . . .

. . . The halfway houses are operated under different        plans. . . . <u>The New York City center is operated under contract by Springfield University.</u>

S. Rep. No. 613 at 3-4 (emphasis added).  According to the Senate Report, Congress envisioned that "under the bill's authority to use community centers for older types of prisoners <u>a similar variety of organizational plans will be adopted.</u>"  <u>Id.</u> at 4  (emphasis added).

Accordingly, for many years BOP has, "with the knowledge of Congress," contracted "for the placement of lower security inmates in private facilities, particularly contract Community Treatment Centers."  1985 Hearing at 22-23 (Testimony of Norman A. Carlson, Director, BOP).  <u>See also</u> <u>id.</u> at 16-17 ("Today we have . . . nearly 2,500 [federal] inmates who are in halfway houses. . . . We contract with State, local and private agencies for this service.").  As Director Carlson testified in 1986, "[s]ince 1981, the Bureau of Prisons has relied solely on the private sector to provide prerelease housing through its community treatment center programs."  Privatization Hearing at 132.  In 1986, BOP "contract[ed] with 330 Community Treatment Centers ["CTCs"], 234 of which [were] privately run.  Over 3,000 Federal inmates [were] in these CTCs. . . .  In 1984, approximately 80 percent of offenders who were serving sentences of over six months and who were released to the community were released through contract CTCs."  <u>Id.</u> at 168 (BOP staff position paper).

GAO apparently does not dispute BOP's authority to enter into private contracts for residential community facilities.  <u>See generally</u> GAO Report at 48-49; <u>see also</u> Robbins at 412. GAO does not believe, however, that the text and legislative history of the 1965 amendment support the conclusion that Congress anticipated use of private <u>secure</u> facilities.  It reasons that the Attorney General had specific statutory authority to contract for juvenile residential community treatment centers.  <u>See</u> 18 U.S.C. § 5040.[12]  Thus, in GAO's view, the 1965 amendment does not demonstrate Congress's view that the Attorney General already had authority to contract for private incarceration facilities, and, at most, it provided that authority for adult residential community facilities.  <u>See also</u> Robbins at 400 ("[T]he meaning of the phrase `or otherwise' has changed, but only to the rather limited extent of permitting [BOP] to contract with private corporations for the confinement of federal prisoners in certain special facilities, such as residential community-treatment centers.").[13]

_____

[12]Section 5040 provides in part that "[t]he Attorney General may contract with any public or private agency or individual and such community-based facilities as halfway houses and foster homes for the . . . custody and care of juveniles in his custody."  Provisions authorizing such private contracts have been in effect since 1938. <u>See</u> Juvenile Justice and Delinquency Act of 1974, Pub. L. No. 93-415, § 510, 88 Stat. 1109, 1138 (1974); Act of June 16, 1938, ch. 486, § 6, 52 Stat. 764, 766.

[13]Robbins contends that because the precursors of section 3621(b) and sections 4002 and 4003 were enacted together, <u>see</u>   1930 Act §§ 3, 4, & 7, the "or otherwise" language of section 3621(b) can only be interpreted

GAO's response misses the point and ignores the statute's plain language. Former section 4082(b), as amended in 1965, gave the Attorney General the authority to place a federal prisoner in a "facility" including, but not limited to, a residential community treatment center. The Senate Report indicates that Congress expected the Attorney General to use the same kinds of arrangements for the adult residential facilities contemplated by the 1965 amendment as already existed in connection with similar facilities for juvenile offenders, at least one of which involved a contract with a nongovernmental entity. S. Rep. No. 613 at 3-4 (under the "authority to use community centers for older types of prisoners a similar variety of organizational plans will be adopted"). Yet Congress apparently saw no need to provide additional authority beyond that inherent in the designation provision itself to allow the Attorney General to enter into contracts with the private sector for adult facilities. This indicates that Congress believed the Attorney General had the authority under former section 4082(b) to enter into such contracts.

There is, moreover, no statutory basis in section 3621(b) for distinguishing between residential community facilities and secure facilities. Because the plain language of section 3621(b) allows BOP to designate "any available penal or correctional facility," we are unwilling to find a limitation on that designation authority based on legislative history. Moreover, the subsequent deletion of the definition of "facility" further undermines the argument that Congress intended to distinguish between residential community facilities and other kinds of facilities. See supra note 11.[14]

_____

as referring to institutions that were authorized by the precursors of sections 4002 and 4003, i.e., federal, state, local, or other public institutions. Robbins at 405-06. He then reasons that the 1965 amendment only broadened the authority now contained in section 3621(b) to include the power to contract for residential community treatment centers:

> Thus, although section 4082(b) was expanded to allow the Attorney General to confine adult federal prisoners in privately run facilities, Congress contemplated such action only with respect to qualified pre-release prisoners in residential community-treatment centers. Congress did not intend the amendment to be a broad grant of authority to place adult federal prisoners in all types of privately run facilities.

Id. at 412-13 (footnote omitted).

Robbins places great weight on the fact that the precursors of section 3621(b) and sections 4002 and 4003 were initially enacted in the same public law. See id. at 405. However, these sections subsequently have been reenacted, amended, and recodified in separate locations in the United States Code. Section 3621(b) is codified in subchapter C (Imprisonment) of chapter 229 of title 18, entitled "Postsentence Administration." Sections 4002 and 4003 are codified in chapter 301 of title 18, entitled "General Provisions," which includes a number of loosely-related provisions. See, e.g., § 4001 (Limitation on detention; control of prisons); § 4004 (Oaths and acknowledgments); § 4005 (Medical relief; expenses). The mere fact that these sections were initially enacted together, without more, does not require that they should be construed in a like manner.

[14]We also note that GAO's construction of the 1965 amendment would mean that the phrase "maintained by the federal government or otherwise" would have two different meanings at the same time: it would mean federal, state, or local government "institutions," but federal, state, local, or private "facilities."

III.

GAO also contends that the language of section 3621(b) can only be understood in conjunction with 18 U.S.C. § 4002, which explicitly authorizes the Attorney General to contract with states and localities for the "imprisonment, subsistence, care, and proper employment" of federal prisoners, and 18 U.S.C. § 4003, which permits the Attorney General to cause appropriate facilities to be erected. See supra note 7. These statutes do not mention contracts with the private sector. GAO argues that sections 4002 and 4003 detail the only two courses of action the Attorney General and, by inference, BOP may take to provide incarceration facilities, and thus provide a statutory limit on the otherwise broad language of section 3621(b). GAO Report at 47-48 & n.8. GAO invokes the maxim of expressio unius est exclusio alterius[15] to conclude that because Congress addressed "two courses of action the federal government may use in order to obtain incarceration facilities" in some detail, the "clear inference is that Congress intended to preclude any arrangement not expressly authorized" by those sections. Id. at 47.

As an initial matter, we question whether application of the expressio unius maxim is appropriate in these circumstances. The statutes at issue here are both affirmative grants of authority. The premise of the maxim -- that the expression of one thing is the exclusion of another -- simply does not apply where the expressions of limitation are set up against an additional affirmative grant of authority. The maxim, it seems to us, is more properly reserved for those circumstances in which the issue is whether the enumeration of items is exhaustive of the authority provided in the absence of other grants of authority. It is quite something else to apply the maxim, as GAO would have us do, to conclude that limitations on a particular grant of authority should also limit a separate grant of authority.

We also note that the maxim of expressio unius is not a rule of substantive law, but a rule of statutory construction based on "'logic and common sense.'" Sutherland § 47.24, at 228 (quoting Herbert Broom, A Selection of Legal Maxims 453 (10th ed. 1939)). It embodies a "presumption that . . . Congress intended to deny all powers not expressly enumerated" and it "should be invoked only when other aids to interpretation suggest that the language at issue was meant to be exclusive." Bailey v. Federal Intermediate Credit Bank, 788 F.2d 498, 500 (8th Cir.) cert. denied, 479 U.S. 915 (1986). Application of the presumption generally occurs where "'there [is] some evidence the legislature intended [the presumption's] . . . application lest it [should] prevail as a rule of construction despite the reason for and the spirit of the enactment.'" Sutherland § 47.25, at 234 (alteration in original) (quoting Columbia Hospital Ass'n. v. City of Milwaukee, 151 N.W.2d 750, 754 (1967)). See also National R.R.

---

[15]Expressio unius est exclusio alterius means "the expression of one thing is the exclusion of another." Black's Law Dictionary 581 (6th ed. 1990). Under the maxim of expressio unius, where a "form of conduct, the manner of its performance and operation, and the persons and things to which it refers are designated, there is an inference that all omissions should be understood as exclusions." Sutherland § 47.23, at 216 (footnotes omitted).

Passenger Corp. v. National Ass'n of R.R. Passengers, 414 U.S. 453, 458 (1974) (expressio unius maxim "must yield to clear contrary evidence of legislative intent.").[16]

Here, the presumption suggested by the expressio unius maxim is undermined by the fact that nothing in the text or legislative history of sections 4002 and 4003 confirms the negative inference that Congress intended by the grants of contracting authority to limit BOP's unqualified section 3621(b) power to designate the place of incarceration of federal prisoners. Sections 4002 and 4003, by their terms, are permissive rather than exclusive. Section 4002 provides that the Attorney General "may contract . . . with the proper authorities of any State, Territory, or political subdivision thereof" in order to "provid[e] suitable quarters for the safekeeping, care, and subsistence" of federal prisoners. Id. (emphasis added). Alternatively, under section 4003 the Attorney General "may . . . cause to be erected" a suitable federal facility. Id. (emphasis added). Nothing in these sections or anywhere else in BOP's enabling legislation could be said to prohibit contracting with the private sector or to establish statutory requirements that would be at variance with such private contracts.

The legislative history of sections 4002 and 4003 indicates that these provisions were enacted specifically to address particular problems in connection with the incarceration of federal prisoners in state and local facilities. Sections 4002 and 4003 were enacted in response to a shortage of prison space for federal prisoners and the lack of a central administrative organization to oversee the disposition of such prisoners. See S. Rep. No. 533 at 2 (statement of the Attorney General). Although the federal government was already relying heavily on state and local facilities for the incarceration of federal prisoners, it was "powerless to remedy the deplorable conditions of filth, contamination, and idleness which [were] present in most of the antiquated jails of the country" and was "obliged to pay the States the rates they charge[d] for boarding Federal prisoners, even though they may be exorbitant." Id.

In response, section 3 of the 1930 Act, the precursor to section 4002, placed specific limitations and requirements on contracts with states and local governments. Section 4 of the 1930 Act, now substantially contained in section 4003, was enacted because emergency conditions and the large number of federal prisoners in certain districts made it desirable for the Department of Justice to have the authority to provide prisons of its own. See S. Rep. No. 533 at 3. Because these provisions were enacted to address specific circumstances involving the incarceration of federal prisoners in federal, state, and local facilities, Congress's failure to

---

[16]This Office has noted on numerous occasions that "[i]n attempting to assess congressional intent, the expressio unius maxim may serve as a guide to that intent, but it is inconclusive. Other factors, including . . . the nature of the legislation, and the legislative history, must also be considered in the effort to discern congressional intent." Applicability of Certain Cross-Cutting Statutes to Block Grants Under the Omnibus Budget Reconciliation Act of 1981, 6 Op. O.L.C. 83, 105 (1982)(footnote omitted). See also Paperwork Reduction Act of 1980, 6 Op. O.L.C. 388, 407 (1982) ("The application of the [expressio unius] maxim is more persuasive when the language of the statute, its legislative history, and other factors point to the same result.").

address contracts with the private sector is not surprising, and does not reflect an intention to prohibit such contracts.[17]

The expressio unius argument is further undermined because BOP does not, as a general matter of federal contracting law, need specific statutory authorization to contract with the private sector. The general rule is that an agency may use contracts with the private sector to carry out its statutory mission as long as the contract is not "specifically prohibited by statute" or "at variance with required statutory provisions or procedures." 1 Ralph C. Nash, Jr. & John Cibinic, Jr., Federal Procurement Law 5, 10 (1977) ("Nash & Cibinic"). As these commentators have explained:

> The authority of the executive to use contracts in carrying out authorized programs is . . . generally assumed in the absence of express statutory prohibitions or limitations. Some statutes contain specific authorization to use contracts, others are silent on the matter and, in some very rare cases, statutes require the use of contracts. However, the executive agencies normally have the discretion to decide whether to accomplish their objectives by contract or through the use of Government employees.

Id. at 5. The courts have recognized that government agencies have broad discretionary powers in carrying out their functions, including the authority to contract for services when it is determined to be in the agency's interest. See, e.g., Local 2017, AFGE v. Brown, 680 F.2d 722 (11th Cir. 1982) cert. denied, 459 U.S. 1104 (1983); Local 2855, AFGE v. United States, 602 F.2d 574 (3d Cir. 1979). Thus, the power of an agency to contract for services is not dependent on specific authority to enter into such contracts. See Memorandum for Clair A. Cripe, General Counsel, Federal Bureau of Prisons, from Ralph Tarr, Deputy Assistant Attorney General, Office of Legal Counsel (Dec. 30, 1982).[18]

---

[17]The argument that the Bureau's 3621(b) designation power is limited by the options spelled out in sections 4002 and 4003 is also undermined by several provisions in BOP's enabling legislation that authorize other permissible places of prisoner incarceration. Section 4125(b) of title 18 authorizes the Attorney General to "establish, equip, and maintain [work] camps upon sites selected by him . . . and designate such camps as places for confinement of persons convicted of" federal offenses. In addition, the Attorney General may use inactive Department of Defense facilities as prisons. Department of Justice Appropriation Authorization Act, Fiscal Year 1979, Pub. L. No. 95-624, § 9, 92 Stat. 3459, 3463 (1978), reprinted in 18 U.S.C. § 4001 note. Thus, sections 4002 and 4003 do not in fact contain all the options available to the Attorney General in designating places of incarceration.

[18]We do not suggest that there are no limitations on the authority of a governmental entity to contract for goods or services. For example, a governmental entity may not enter into a contract that is specifically prohibited by statute or that is at variance with statutory provisions or procedures. See 1 Nash & Cibinic at 10. In addition, some functions are considered to be inherently governmental in nature and may not be delegated to nongovernmental entities. See OMB Circular A-76 (Aug. 4, 1983). This memorandum also does not address possible constitutional limitations on contracting. See generally Constitutional Limits on "Contracting Out" Department of Justice Functions Under OMB Circular A-76, 14 Op. O.L.C. 94 (1990). We are, of course, available to consult with you or your staff as to constitutional issues that might arise in connection with contracts with the private sector for prison facilities.

It is well established that BOP has authority to contract with the private sector for various services in connection with incarceration facilities. See Opinion Request (citing 40 U.S.C. § 471; 41 U.S.C. § 252(a); 48 C.F.R. §§ 1.101, 2.101); Privatization Hearing at 132-33, 170-72. For example, BOP has entered into private contracts for food service and medical, educational, and psychological services, and for consulting and other services in connection with Federal Prison Industries. Privatization Hearing at 132-33, 170-72. See also President's Commission at 147 ("Contracting for services and nonsecure facilities is a common practice in the field of corrections. Virtually all the individual components of corrections (such as food services, medical services and counseling, educational and vocational training, recreation, maintenance, transportation, security and industrial programs) have been provided by private contractors.").

GAO claims that it does not dispute BOP's authority generally to contract with the private sector for goods and services. See GAO Report at 50 ("As a general proposition, an agency may use contracts to carry out any activity that the agency is authorized to perform under its enabling legislation or other statutory provision without a specific grant of contracting authority."). Rather, GAO contends that contracting with the private sector for incarceration facilities would be "inconsistent with the statutory scheme," which "describes with specificity the courses of action the government may use to obtain incarceration facilities." Id. See generally 1 Nash & Cibinic at 10 (governmental entity may not enter into a "contract which is specifically prohibited by statute, or at variance with required statutory provisions or procedures"). GAO's argument proves too much. Section 4002 states that "the Attorney General may contract . . . with the proper authorities of any State, Territory, or political subdivision thereof, for imprisonment, subsistence, care, and proper employment of such persons." Id. (emphasis added). To the extent GAO believes that contracting for private incarceration facilities would be inconsistent with section 4002, private contracting for other items involving the subsistence and care of prisoners would call into question BOP's well-established authority, apparently not questioned by Congress, to enter into contracts with the private sector for food service, clothing, and other goods and services.

More fundamentally, we disagree with GAO's assertion that private contracts for incarceration of federal prisoners would be "inconsistent with the statutory scheme." GAO Report at 50. As we have previously explained, see supra pp. 67-70, 72-73, nothing in the text or legislative history of section 3621(b) or sections 4002 and 4003 indicates that Congress intended to prohibit such contracts. Given the broad and unlimited designation authority contained in section 3621(b), we cannot conclude that private contracts would "conflict with the statutory scheme" based on the grants of authority contained in sections 4002 and 4003 and Congress' purported silence concerning private contracts.[19]

---

[19]We also reject GAO's contention that our interpretation of section 3621(b) is undercut by certain other statutes that explicitly authorize the use of private facilities for confinement. GAO Report at 49-50 (citing 18 U.S.C. §§ 4013(a)(3) and 5040). The weakness of the argument can be seen by applying it consistently to 18 U.S.C. § 4013.

Section 4013(a) authorizes the Attorney General to make payments from appropriated funds:

## Conclusion

For the foregoing reasons, we conclude that the Bureau of Prisons has the statutory authority to contract with the private sector for secure facilities.


TIMOTHY E. FLANIGAN
Acting Assistant Attorney General
Office of Legal Counsel

---

[in] support of United States prisoners [in non-Federal institutions] for --

    (1) necessary clothing;
    (2) medical care and necessary guard hire;
    (3) the housing, care, and security of persons held in custody of a United States
marshal . . . under agreements with State or local units of government or contracts with private
entities;

(emphasis added).  GAO argues that section 4013(a)(3)'s reference to private contracts for prisoner incarceration indicates that when Congress intended to allow private contracting it did so explicitly.  Again, GAO's argument proves too much.  It would preclude private contracting for clothing, medical care, and security because subsections (a)(1) and (a)(2) do not explicitly permit private contracts as compared to subsection (a)(3).  That would again call into question the Bureau's well-established authority to contract with the private sector for such items.  See supra p. 74.

# EXHIBIT "F"





Newsweek

> Home Page | > Cover Story | > Archives | > Feedback | > Index

National News

Advertise



News
Business
Sports
Tech-Science
Living
Travel
Health
TV News
Opinions
Weather-Local
Shop@MSNBC
MSN.com

QwestDex
online yellow pages
Find a Local Business

A new rule about halfway houses comes at a bad time for David Duke

# Hard Time for Corporate Perps

**John Ashcroft says white-collar felons will now have to serve their sentences in prisons**

By Michael Isikoff
NEWSWEEK WEB EXCLUSIVE

Br

Giv

gi

n

**Dec. 20 —** In a dramatic Christmas-season crackdown, Attorney General John Ashcroft's top deputies have rebuked the director of federal prisons and ordered her to summarily remove 125 white collar felons from relatively lenient halfway houses and immediately relocate them to actual prisons.

● E-MAIL THIS ✉                    ● COMPLETE STORY ↴

ADVERTISING ON MSNBC



• eDiets Diet Center
• Shop at B&N.com

Newswee
News
• Race to t
• Dreams
• Pies in t

• Auctions at uBid
• Yellow Pages
• lavalife.com  Where
singles click
• MSN Broadband



Newswee

• Patti Da
  New Ye
• Brazil:
  for Lula?
• Starr: W
  Games
• Q&A: A
  Shoppin





THE DIRECTIVE—SPELLED out in internal memos obtained by NEWSWEEK—is part of a potentially far-reaching new policy designed by Ashcroft's top aides to insure "real time" in federal prisons for convicted tax evaders, inside traders and other white-collar malefactors.

The Justice directive, signed this week by Deputy Attorney General Larry D. Thompson, orders Kathleen Hawk Sawyer, director of the Bureau of Prisons (BOP), to put an immediate end to a longstanding BOP practice that has allowed hundreds of white-collar felons to avoid spending any time in prison. Instead, BOP has routinely assigned these felons with relatively short prison terms of two years or less to "community corrections centers" or halfway houses in which inmates go to work in the community and go home to visit their families on weekends—privileges not available to inmates in prison.

The new policy move, officials said, is partly intended to strengthen the hands of federal prosecutors in high-priority cases like the Enron and WorldCom scandals. Officials say they are trying to signal to reluctant targets in those cases that they should cooperate with the government—or else. "There's a clear signal being sent here," says one department official. "We're not going to tolerate preferential treatment for rich corporate executives who have broken the law."

Since the Enron scandal erupted last year, Ashcroft and his top aides have sought to deflect any political damage away from the Bush White House by showing that the Justice Department was prepared to prosecute corporate criminals just as aggressively as drug dealers and terrorists.

Along the way, Justice officials have taken a number of controversial steps, including staging "perp walks" in which prominent corporate executives, such as Enron's Andrew S. Fastow and Adelphia's John Rigas, were paraded before TV cameras after being arrested. These and other practices have drawn howls of outrage from corporate defense lawyers who have accused Justice officials of "PR stunts" that trampled on the constitutional rights of their clients.

While not as high profile as the perp walks, the new Justice ban on alternatives to prison may prove far more consequential in the long run, officials say. The BOP's practice of sending white-collar felons to halfway houses dates back at least 10 years. Officials say it has allowed many relatively affluent, and disproportionately white, convicts to avoid doing prison time—even when their judicially imposed sentences under federal guidelines explicitly called for "imprisonment."

BOP officials had justified the practice on the grounds that in many cases the assignments to halfway houses were recommended by federal judges and that the inmates in question were invariably first-time offenders who posed no physical threat to the community.

Ashcroft aides say they didn't learn about the BOP practice until last year when a federal judge in West Virginia wrote Ashcroft a letter about a local dentist who defrauded the government of more than $500,000 in taxes. Despite the dentist's conviction on a sentence that called for jail time, the man never actually went to prison. The letter from U.S. Judge Joseph Goodwin, a Clinton appointee, triggered an internal review by the Department of Justice's Office of Legal Counsel. "Our guys were outraged," says one DOJ official.

The review culminated this week in a sternly worded Dec. 16 directive from Thompson to BOP director Sawyer. Thompson called BOP's actions "unlawful" and a clear violation of "unambiguous" federal guidelines calling for prison time for white-collar convicts. He ordered prison officials to "immediately" start changing the bureau's practices— including transferring white-collar convicts currently in halfway houses into prisons. Officials say this will immediately apply to 125 inmates currently in halfway houses—and potentially hundreds more each year, including a number of high-profile defendants facing charges by the DOJ's corporate-crime task force.

Thompson wrote in his two-and-a-half-page memo that BOP's "current placement practices run the risk of eroding public confidence in the federal judicial system.



White-collar criminals are no less deserving of incarceration ... than conventional offenders."

He also said the BOP's policy was undercutting "the powerful deterrent effect" that real prison time can have on white-collar criminals, especially given the fact that such individuals "are often better educated and more rational than other criminals and are thus more likely to weigh the risk of possible courses of action against the anticipated rewards of criminal behavior."

The directive to Sawyer was unusual because it constituted a rare rebuke of a top Justice Department official by a superior. (The BOP is part of the Justice Department.) A spokeswoman for Sawyer declined comment and said the director would not be available for an interview. After receiving Thompson's memo, Sawyer today issued her own memo to all federal judges notifying them of "a significant procedure change" in its practices of sending inmates requiring imprisonment to community corrections centers (CCCs). "Effective immediately, this practice will no longer be followed," Sawyer wrote the judges. "The Bureau will not use CCCs as a substitute for imprisonment."

Officials say they were unable to identify any current inmates who will be immediately affected by the transfer. But one high-profile defendant who is likely to be affected soon, officials said, is David Duke, the former Ku Klux Klan leader and white supremacist who this week pled guilty to mail and tax fraud. Duke was accused by prosecutors of raising thousands of dollars from supporters and then misusing the money for personal investments and gambling trips to Mississippi's Gulf Coast.

As a result of his guilty plea, Duke, 52, is eligible for a prison term of up to 15 months under federal guidelines. Under BOP's old policy, that would likely have meant time in a halfway house. Now, officials said, he will almost certainly go to prison. Duke's lawyer did not return a phone call seeking comment.

© 2002 Newsweek, Inc.

---

**MORE NEWSWEEK NATIONAL NEWS**

[STORY] Race to the Exit
[STORY] Dreamscapes
[STORY] Pies in the Skies
[HOME] MSNBC Cover Page

washingtonpost.com

# White-Collar Crime Now Gets Real Time
New Federal Prison Policy Criticized

By Dan Eggen
Washington Post Staff Writer
Tuesday, January 7, 2003; Page A06

Federal corrections officials will begin transferring 125 nonviolent offenders from halfway houses to regular prisons this month as part of a Justice Department crackdown on white-collar criminals, who will no longer be able to evade prison by serving time in low-security community facilities.

The new policy means that hundreds of other white-collar defendants, including some of those caught up in the financial scandals at Enron, WorldCom and other corporations, also have lost a detention option used by the U.S. Bureau of Prisons (BOP) for nearly two decades.

Under the old policy, federal prisons officials allowed many first-time nonviolent offenders to serve their sentences in community corrections centers -- halfway houses -- rather than prison.

Defense attorneys, and many federal prisons officials, supported the approach as a way to ease prison crowding and encourage rehabilitation of low-risk criminals. But many federal prosecutors have long complained that the policy allowed wealthy criminals to circumvent federal sentencing guidelines.

"These white-collar defendants were getting a benefit that was not available to non-white-collar defendants," one longtime former federal prosecutor said. "It tended to be the situation where, if you were richer and whiter than your typical defendant, you could find all these ways to get to a halfway house."

After a legal review by Justice Department lawyers, Deputy Attorney General Larry Thompson issued an unusual rebuke last month to the head of the prisons bureau, Kathleen Hawk Sawyer, arguing that corrections officials had overstepped their authority in allowing prison sentences to be served in halfway houses and had undermined the deterrence value of real prison time.

Officials said the Justice Department review was prompted by a federal judge's complaint in a West Virginia tax-fraud case. They acknowledged that the policy change also could have a big impact on financial executives convicted of federal crimes because they will have less hope of evading prison time.

"The message is that we are not going to be treating white-collar criminals any differently than the law mandates," Justice spokesman Mark Corallo said. The new policy, first reported by Newsweek magazine, is also likely to affect hundreds of cases working their way through the judicial system.

The new approach has come under fire from the defense bar and prisoner advocates, who say it will increase crowding and decrease the chances for prosecutors to strike deals with low-risk offenders.

"It's a cheap political trick on the part of the people who have done this," said Elizabeth Alexander, director of the National Prison Project of the American Civil Liberties Union. "It raises very serious questions given that this is what BOP has traditionally done, and it is viewed as a reasonable option by federal judges."

Raag Singhal, co-chairman of the corrections committee at the National Association of Criminal Defense Lawyers, said removing halfway houses as a sentencing option runs counter to recent trends in state judicial systems, which are increasingly turning to community corrections as a way to save money and ease prison crowding.

"I don't think it's going to do anything to increase the public's confidence in the treatment of white-collar criminals," said Singhal, an attorney in Fort Lauderdale, Fla., who represents several clients affected by the new policy. "They can do much more good at a halfway house than any prison."

Linda Smith, a BOP spokeswoman, said about 600 federal prisoners are in halfway houses as part of "direct court commitments," in which a federal judge recommended a detention more lenient than prison. About 125 of those prisoners -- all of whom had more than 150 days remaining on their sentences as of Dec. 20 -- will be transferred to prisons beginning later this month, Smith said.

The new policy will not affect the use of halfway houses as a transitional point for prisoners nearing the end of their sentences, officials said. About 8,600 of the federal government's 164,000 prisoners are now in halfway houses.

The original policy allowing the use of halfway houses for imprisonment was rooted in a 1985 legal opinion by the BOP's general counsel, Smith said. But in a review of the issue, the Justice Department's Office of Legal Counsel found that the prisons bureau had overstepped its legal authority in adopting halfway houses as a detention option.

"Community confinement does not constitute imprisonment for purposes of a sentencing order, and BOP lacks clear general statutory authority to place in community confinement an offender who has been sentenced to a term of imprisonment," M. Edward Whelan III, principal deputy assistant attorney general, wrote in a Dec. 13 legal opinion. "BOP's practice is therefore unlawful."

Sawyer, the head of the prisons bureau, notified federal judges and other court officials of the legal opinion and policy change Dec. 20. Halfway house inmates began receiving letters Dec. 23 notifying them that they would be transferred to regular prisons in late January or early February.

One defendant in the Midwest, who asked that her name not be used, has been notified that she will go to a prison more than 1,000 miles from her home rather than live in a halfway house nearby. "They're saying I can't work, I can't see my family and the sentence the judge imposed doesn't matter," said the woman, who pleaded guilty to a fraud charge as part of an agreement with prosecutors. "I would never have agreed to this if I had known it would turn out like this."

© 2003 The Washington Post Company

*EXHIBIT "G"*

http://www.boston.com/dailynews/010/region/Judge_prevents_transfer_of_criP.s html

Judge prevents transfer of criminals from halfway houses to prison

By Associated Press, 1/10/2003 07:22

SPRINGFIELD, Mass. (AP) A federal judge is stalling the U.S. Department of Justice from moving two criminals from halfway houses to federal prison. U.S. District Court Judge Michael Ponsor issued a temporary restraining order Thursday preventing the prison transfers of a bookie and drug dealer he sentenced last year to halfway houses.

A new justice department policy that took effect last month ordered that judges could no longer sentence federal prisoners to halfway houses, where they are allowed to work or see their families during the day but are confined overnight. The new policy also forces inmates with more than 150 days left on an existing community-based sentence to serve it out in jail. But Ponsor said he may have punished the men differently if he knew the government would rescind the halfway house sentencing option.

''That's something that really eats at me, and undermines the integrity of the sentencing process,'' Ponsor said.

The two criminals are Frank E. Iacaboni, of Leominster, who was sentenced to community confinement after admitting to illegal gambling and money laundering charges, and Donovan McKenzie, a New York City man sentenced for his part in a Springfield cocaine trafficking ring.

A third man, Mark A. Pandolfi, of Springfield, also had his time behind bars postponed.

Ponsor had recommended that Pandolfi serve 10 months in a community setting rather than behind bars for refusing to testify in front of a grand jury last month about possible loan sharking and public corruption.

Pandolfi had not yet learned where he would serve his sentence when the policy change went into effect, so Ponsor issued an indefinite stay for his confinement.

Pandolfi's lawyer, Thomas J. Rooke, said he will file a motion to try to persuade Ponsor to correct his client's sentence.

'The (Bureau of Prisons) has now unilaterally shut the door on the judge's intent. That was a mistake,'' Rooke said.

Assistant U.S. Attorney Andrew Levchuk argued that the Bureau of Prisons always had discretion over where defendants served their time, and the policy change is not as startling as judges and defense make it out to be. Levchuk also argued against the restraining order Ponsor issued.

'It's our position that you have no authority to issue that order,'' Levchuk said.

Lawyers will reconvene Jan. 27 to argue their cases.

Citation             Search Result      Rank 2 of 75     Database
1/10/03 SPRGFLDNEWS B01                           ALLNEWSPLI
1/10/03 Springfield Union-News B01
2003 WL 5126432
(Publication page references are not available for this document.)

Springfield Union-News
Copyright (c) 2003. Springfield Union-News All Rights Reserved.  Used by
Factiva with Permission.

Friday, January 10, 2003

News

## Judge balks at U.S. prison policy
### STEPHANIE BARRY
### STAFF

SPRINGFIELD - Following a sudden change in federal prison policy, a
local judge yesterday moved to temporarily bar the government from
throwing two defendants behind bars, and postponed what may be an
inevitable stint in prison for a third.

During a hearing in U.S. District Court, Judge Michael A. Ponsor
issued a temporary restraining order against the U.S. Department of
Justice, preventing the agency from transferring two men who were
sentenced here last year from halfway houses to federal prison. They are
among 125 federal inmates serving time in community corrections
facilities who may be forced to finish their sentences behind bars,
compliments of a government crackdown on white-collar and nonviolent
criminals who have evaded jail.

The two local defendants are Frank E. Iacaboni, of Leominster, a
former bookie who last year was sentenced to community confinement after
he pleaded guilty to illegal gambling and money laundering conspiracy
charges, and Donovan McKenzie, a New York City man who was recently
sentenced for his part in a cocaine trafficking ring in this city.

A third man, former city employee Mark A. Pandolfi of Springfield,
was last month sentenced to a 10-month term for refusing to testify in
front of a grand jury about possible loan-sharking and public
corruption. Ponsor recommended that Pandolfi serve his sentence in a
community setting rather than behind bars, but that option was abruptly
yanked last month.

The Department of Justice ordered that sentencing federal prisoners
directly to halfway houses - where they are allowed to work or see their
families during the day but are confined overnight - is no longer an
option for judges. The change was effective Dec. 20, and inmates began
receiving letters from the U.S. Bureau of Prisons about their imminent

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Page
1/10/03 SPRGFLDNEWS B01
(Publication page references are not available for this document.)

transfers two days before Christmas.

In addition to deleting straight community confinement from judges' repertoires, the new policy will force any inmate with more than 150 days left on an existing community-based sentence to serve it out in jail. The new policy will not affect the use of halfway houses for those nearing the end of their sentences.

Halfway houses have been touted as a far less costly alternative to prison and an effective way to allow nonviolent offenders to continue to work and maintain relationships with their families.

Pandolfi had not yet learned where he would serve his sentence when the policy change went into effect. Ponsor yesterday issued an indefinite stay for the tight-lipped defendant's departure - originally slated for Tuesday - to give defense lawyers time to mull over strategies to keep their clients out of jail.

Pandolfi's lawyer, Thomas J. Rooke of Springfield, said he will file a motion to try to persuade Ponsor to correct his client's sentence.

"The (Bureau of Prisons) has now unilaterally shut the door on the judge's intent. That was a mistake," Rooke said.

Indeed, Ponsor said repeatedly in court yesterday that he may have considered different penalties for all three defendants if he had known the government would rescind community confinement as a sentencing option.

"That's something that really eats at me, and undermines the integrity of the sentencing process," Ponsor said.

Assistant U.S. Attorney Andrew G. Levchuk argued that the Bureau of Prisons always had discretion over where defendants served their time, and the policy change is not as startling as judges and defense make it out to be. Levchuk also argued against the restraining order Ponsor issued.

"It's our position that you have no authority to issue that order," Levchuk said.

Indeed, Ponsor said legal skirmishes over the policy change have begun cropping up in courts across the country, leading many judges and lawyers into uncharted territory.

"We're all going over Niagara Falls on a tea tray," Ponsor told Levchuk.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1/10/03 SPRGFLDNEWS B01
(Publication page references are not available for this document.)

The group will reconvene Jan. 27 to argue their cases.

Stephanie Barry can be reached at sbarry@union-news.com

---- INDEX REFERENCES ----

KEY WORDS:         COURT

NEWS SUBJECT:      Law Enforcement; English language content; Crime/Courts;
Political/General News; Crime (GHOME ENGL GCRIM GCAT CRM)

STORY ORIGIN:      SPRINGFIELD

REGION:            United States; United States; North American Countries (US
USA NAMZ)

EDITION:           SPRINGFIELD

Word Count: 639
1/10/03 SPRGFLDNEWS B01
END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

JAN 2 4 2003

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ANTONIO BUGARIN-JUAREZ, | No. 03-55141 |
| Petitioner - Appellant, | D.C. No. CV-03-00011-MJL |
| v. | Southern California (San Diego) |
| GRANT WEISS, Director, Pacific Furlough Facility; et al., | ORDER |
| Respondents - Appellees. | |

Before: REINHARDT and PAEZ, Circuit Judges

Appellant's January 23, 2003 emergency motion for a stay of the district court's order denying injunctive relief is granted. The Bureau of Prisons and the Pacific Furlough Facility are enjoined from transferring appellant from the Pacific Furlough Facility pending this appeal, or until further order of this court. To the extent appellant is requesting this court to direct the district court to hold a hearing on the merits of appellant's application for a temporary restraining order, that request is denied.

The appeal filed on January 23, 2003 is a preliminary injunction appeal. *See Religious Tech. Ctr. v. Scott*, 869 F.2d 1306, 1308 (9th Cir. 1989) (stating an order

03-55141

denying a temporary restraining order is appealable if it is tantamount to denial of a preliminary injunction). Accordingly, Ninth Circuit Rule 3-3 shall apply.

The briefing schedule is set as follows: the opening brief is due not later than February 20, 2003; the answering brief is due March 20, 2003, or 28 days from service of the opening brief, whichever is earlier; and the optional reply brief is due within 14 days of service of the answering brief. *See* 9th Cir. R. 3-3(b). If appellant fails to file timely the opening brief, this appeal will be dismissed automatically by the Clerk for failure to prosecute. *See* 9th Cir. r. 42-1.

This appeal and any motions pending when briefing is completed shall be referred to the next available motions panel for disposition. *See* 9th Cir. R. 3-3(d).

**Date:**   2/7/2003 2:51 PM
**Sender:** bopwatch@yahoogroups.com
**To:**     "BOPWatch Newsletter (E-mail)" <bopwatch@yahoogroups.com>
**bcc:**    Shereen Charlick
**Priority:** Normal
**Subject:** [BOPWatch] CCC Litigation
Mobile lawyers challenge Ashcroft's halfway house order


Mobile lawsuit seeks injunction against Ashcroft order
overriding judges'
recommendations


02/07/03


By JOE DANBORN
Staff Reporter


A group of Mobile defense lawyers has sued the Federal Bureau
of Prisons on
behalf of clients whom federal authorities are sending to
prison rather than
the halfway houses recommended by judges in their cases.


The lawsuit -- and others like it around the country -- seeks
an injunction
against a recent decision by U.S. Attorney General John
Ashcroft to quit
following recommendations from judges and other court officers
for halfway
house sentences.


Six weeks ago, an Ashcroft deputy sent a memo to the head of
the U.S. Bureau
of Prisons, telling her to stop using halfway houses
altogether. The memo
followed an opinion from the Justice Department's Office of
Legal Counsel
that berated the BOP for its long-standing practice of carrying
out federal
judges' requests regarding where convicts should serve their
time.


"Community confinement does not constitute imprisonment for
purposes of a
sentencing order, and BOP lacks clear general statutory
authority to place
in community confinement an offender who has been sentenced to
a term of
imprisonment," the opinion declares.


A Justice Department spokesman said Thursday that officials
there were
unaware of the BOP's practice until recently, even though the

practice
itself dates back at least 37 years.


To qualify for sentencing to a halfway house, a convict must be a
first-time, non-violent offender, a description that fits most white-collar
criminals.


"There can't be two standards of law, one for one group of criminals and one
for white-collar criminals," said Mark Corallo, the spokesman.


Dom Soto, one of the lawyers in the Mobile case, said he did not object to
that logic.


"If it's letting all those creeps from Enron get out of prison time because
they have judge friends, well I agree, let's stop it," Soto said. "But it
doesn't take into account people in situations like our clients are in."


All three convicts in the Mobile lawsuit were sentenced to terms of five
months or less, with the judge in each case recommending that the time be
served at the Community Corrections Center on the Mobile Bay Causeway. Now,
however, the BOP has ordered them to report to penitentiaries.


As with most halfway house cases, the three Mobile convicts each convinced a
judge and other court officers that society and the inmates would be better
served by allowing them to continue to work.


April Mizell Estes, of Citronelle, pleaded guilty to bank fraud. She has a
4-year-old daughter, an infant son and a third child due in May. Chief U.S.
District Judge Charles Butler Jr. sentenced her to five months at the
halfway house and ordered her to repay $75,275, which she has been paying
back ahead of schedule, according to the lawsuit.


Antonio Madden and his wife pleaded guilty to conspiring to possess Ecstasy
with the intent to distribute. They faced up to 12 months of confinement.
Hearing that Madden's wife was disabled and needed surgery and

that Madden
would have to support her, Senior U.S. District Judge Richard
Vollmer Jr.
sentenced her to home confinement and Madden to the halfway
house.


Scotty Summers likewise pleaded guilty to conspiring to deal
Ecstasy and got
a five-month term from Vollmer, with the added recommendation
that he be
admitted to drug and mental health treatment programs at the
halfway house.
Instead, the BOP wants him to enter a Mississippi prison that
offers no such
programs, the lawsuit states.


All three are due to report to prison before the end of the
month. Public
defender Chris Knight, Estes' lawyer, said he would ask Butler
to postpone
that deadline until after the judge has heard arguments on the
convicts'
request for a restraining order.


A BOP spokeswoman said the new policy means 125 inmates face
transfer from
halfway houses to prison. She offered no guess as to how many
inmates get
halfway house sentences each year, but said officials had
determined the
additional inmates would place no strain on the federal prison
system. For
now, inmates may only enter a halfway house to serve out the
final 10
percent of their sentences.


Late last month, a federal judge in Washington, D.C., blocked
the BOP from
sending a convict to prison, while a judge in Detroit ruled
against a
convict there. Cases are pending in Arkansas, Maryland,
Massachusetts, New
York, North Carolina, Tennessee, according to the National
Association of
Criminal Defense Lawyers.


Already, defense lawyers and judicial officers are looking for
ways around
the new policy. After the Justice Department decided that the
change would
affect only those half way house inmates with 150 days or more
left to
serve, Butler took one month off Estes' sentence, but the BOP
still ordered
her to report to prison in Tallahassee, Fla. Moreover, U.S.
marshals in

Mobile asked the BOP for an exception in Estes' case due to a
clerical error
on their part, but the BOP turned them down, Knight said.


On Wednesday, the same day the Mobile lawsuit was filed, Butler
sentenced
another of Knight's clients to five years of probation, but
made it a
condition of that probation that he serve five months of it in
a halfway
house. Whether that and similar maneuvers stand unchallenged
remains to be
seen, Knight said.


"It does somewhat complicate things because we've always relied
on the
court's authority to at least recommend halfway house
confinement in less
serious cases."


Copyright 2003 al.com. All Rights Reserved.


*

        Howard O. Kieffer
*

        Executive Director
*

        Federal Defense Associates
*

        http://www.guiltyornot.com <http://www.guiltyornot.com/>
*

        Moderator BOPWatch
*

        <http://groups.yahoo.com/group/bopwatch/>
http://groups.yahoo.com/group/bopwatch/
*

        <mailto:hkieffer@dcounsel.com> hkieffer@dcounsel.com
<http://www.nacdl.org/images/memberlogo.gif>


memberlogo.gif

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | | |
|---|---|---|
| DEBORAH E. BENTON, | ) | Civil Action No. |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **PROOF OF SERVICE** |
| | ) | |
| JOHN A. ASHCROFT, ATTORNEY | ) | |
| GENERAL, UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE and UNITED | ) | |
| STATES DEPARTMENT OF JUSTICE | ) | |
| FEDERAL BUREAU OF PRISONS, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

I, the undersigned, say:

1.      That I am over eighteen (18) years of age, a resident of the County of San Diego, State of California, not a party in the within action, and that my business address is 225 Broadway, Suite 900, San Diego, California, 92101-5008; and

2.      That I served delivered and original and four copies of the <u>PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT FOR WRIT OF HABEAS CORPUS</u> and <u>APPLICATION FOR PRELIMINARY INJUNCTION</u>  and to the United States District Court, Southern District of California, and

3.      That I served the a copy of the within  <u>PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT FOR WRIT OF HABEAS CORPUS</u> and <u>APPLICATION FOR PRELIMINARY INJUNCTION</u> to all parties via certified mail:

> **JOHN D. ASHCROFT, Attorney General**
>  **of the United States**
> **U.S. Department of Justice**
> **950 Pennsylvania Avenue NW**
> **Washington, D.C. 20530-0001**
>
> **FEDERAL BUREAU OF PRISONS**
> **Department of Justice**
> **320 First Street NW**
> **Washington, D.C. 20534**

4.      That the same were delivered and deposited in the U.S. mails, first class postage prepaid, at San Diego, California, on February 7, 2003.

I certify that the foregoing is true and correct. Executed on February 7, 2003, at San Diego, California.

MARGARITA GONZALES